EDWARD H. VAN INGEN, Respondent, v. THE MAIL AND EXPRESS PUBLISHING COMPANY, Appellant.

1. LIBEL — EVIDENCE IDENTIFYING PERSON ALLUDED TO. Where a libel does not name the plaintiff, he may give evidence of all the surrounding circumstances and other extraneous facts which will explain and point out the person to whom the allusion applies.

2. NEWSPAPER LIBEL — EVIDENCE — ADMISSIBILITY OF ARTICLES FROM OTHER NEWSPAPERS. Where a newspaper libel, not naming the plaintiff, is based upon articles naming the plaintiff, which were previously published on the same day in other newspapers, having a general circulation in the same community, the plaintiff is entitled to give such articles in evidence, when tending to prove the condition of the public mind and the means of information the public had, as attendant circumstances indicating that the defendant's article referred to the plaintiff.

3. ADMISSIBILITY IN EVIDENCE FOR PLAINTIFF OF ARTICLES FROM OTHER NEWSPAPERS, BROUGHT INTO THE CASE BY DEFENDANT. When, on the cross-examination of the plaintiff, in an action for a newspaper libel, the defendant's counsel elicits the fact that articles relating to the same subject were previously published in other papers on the same day, for the purpose of showing that all the injury the plaintiff's reputation had suffered was caused by such previous articles, the defendant cannot properly object to the admission in evidence of the articles themselves.

*Van Ingen* v. *Mail & Express Pub. Co.*, 14 Misc. Rep. 326, affirmed.

(Argued May 13, 1898; decided June 7, 1898.)

APPEAL from a judgment of the General Term of the late Court of Common Pleas for the city and county of New York, entered November 8, 1895, affirming a judgment for plaintiff entered upon a verdict, and an order denying a motion for a new trial.

This action was brought to recover damages for the publication of an alleged libelous article in "*The Mail and Express*," on the evening of the 7th day of November, 1892.

The article reads as follows:

"BRITISH GOLD TO HELP CLEVELAND.

"DEMOCRATS AND THEIR ENGLISH ALLIES ATTEMPT TO PURCHASE VOTES. AMERICANS WILL RESENT THE INSULT.

"Not the First Time That the Claimant Has Appealed to His Free Trade Friends Across the Sea to Come to His Assist-

ance — The Workingmen Will Give their Answer to This Diabolical Outrage To-morrow — The Closing Days of a Spirited Campaign.

" The Cobden Club of England has apparently become tired of trying to influence United States elections in behalf of democratic free-trade candidates by spending millions of dollars in the campaign here, and the friends of the free-trade claimant have had to hustle about Great Britain themselves to get the money which English manufacturers are willing to give up to buy votes for their friend Cleveland, and to kill their most hated enemy, McKinley Bill.

" The account of the raising abroad of a great corruption fund by protection America's enemies and free-trade Cleveland's friends, has just been cabled over.

" The London head of a large New York firm of cloth jobbers is reported as the leader of this movement, to get together and send to America nearly half a million of British gold with which to push the course of the anti-tariff democracy and its candidate for the Presidency, Cleveland.

" To him and his representatives the mill owners of Bradford, Huddersfield, and other big manufacturing and woolen jobbing centers, under the representations that only under Cleveland as President could the American market be opened to them, gave freely of their money to help the claimant's campaign.

                    " THE FUND ESTIMATED.

" The Cleveland British fund is estimated by several well-known Americans in England to have amounted in all to about $500,000.  The claimant's friends in London refused to deny to the press that he had raised English money to such an amount to be spent on Cleveland.

" The money is reported as all here, the claimant's old secretary and adviser, Dan Lamont, having, it is said, brought a part of it with him on his recent return from abroad and given it to the democratic managers a week ago last Wednesday.

" The balance is understood to have been cabled last week, and that that time is probably correct, the hurried sending of large sums of money to the west to buy votes for Cleveland last week is satisfactory proof.

" Republican Managers not Alarmed.

" The news of the joining of Democratic forces with the free-trade English manufacturers did not dismay the Republican leaders this morning. They expressed themselves as so confident of Harrison's re-election that no foreign interference with the franchise and electorate of our country could prevent the triumphant entrance of the Republican party and its principles into another four years' management of the nation's affairs.

" The leaders at headquarters, however, spoke in the most unscathing terms of this traitorous alliance of a great political party of America with the nation's bitterest foes, and declared it a fitting climax to the unpatriotic and corrupt campaign of the Democratic party."

In the course of the trial there were admitted in evidence three different articles published respectively on the 7th day of November, 1892, in the " Morning Advertiser," the " New York Recorder " and the " New York Press."

The article published in the " Morning Advertiser " reads as follows:

" British Gold! From a Quarter to Half a Million Dollars raised in London to Help Cleveland.

" The Money Already Here. E. H. Van Ingen, a New York Merchant, is said to be at the head of the Movement.

" Ochiltree confirms it. Other Gentlemen also say English Exporters are doing all they can for Grover.

" To Kill the Tariff Bill. English Manufacturers and American Importers want to injure our Industries.

" (By cable to the Morning Advertiser):

" London, Nov. 6.— It became known here yesterday that an enormus corruption fund had been raised among the English exporters, manufacturers and merchants who are interested in

the removal of the McKinley Tariff, and that it had already been forwarded to the Democratic General Committee in New York, to be used for the purpose of buying votes and other dishonorable expedients, to bring about the election of Mr. Cleveland. The head of the movement is said to be E. H. Van Ingen, of the New York Importing House of E. H. Van Ingen & Co., of 160 Fifth avenue.

Mr. Van Ingen, when seen this evening, was very much disturbed. He positively refused to be interviewed on the subject, and just as positively refused to deny the story. Failing to draw Mr. Van Ingen from his reserve, the reporter broached the matter to another gentleman holding a responsible position in the firm, who verified the story and referred to several well-known Americans in London from whom full information on the matter could be derived. At the same time the gentleman stated that the fund amounted to between $250,000 and $500,000, and was already in the hands of the Democratic Committee.

## " TOM OCHILTREE HEARD OF THE FUND.

" Ex-Congressman Ochiltree was also seen and asked if he knew anything of the matter.

" ' I know Van Ingen,' he said. ' He is a rich New York cloth manufacturer, and I also know he is at the head of a large fund which has been raised in this country to help in the election of Cleveland. I have reason to believe that the fund amounts to nearly a half a million of dollars, and I am afraid that I must call it a corruption fund, for that is certainly its ultimate destination.

" ' I have been thrown frequently in contact with many of the leading manufacturers and the large dealers here who export goods to America, and, notwithstanding that in some instances the duties are almost prohibitive, they still continue to send goods, and, what is more, they try in every instance to make exorbitant profits.

" ' The business depression of all kinds here ever since the Baring failure has been something awful to contemplate. Things have been practically dead for some time, and the

future is not illumined by a single ray of hope.   The average Englishman is not conversant with our system of government, and he believes that the election of Cleveland would mean an instantaneous change in our policy, as is sometimes the case when a change of ministry occurs here, and the immediate repeal of the whole protection system, so that goods could be shipped by the next steamer after election, and large profits would once more gladden his heart, and the hated protection would be abolished.   The Englishman is the greatest gambler in the world.   He gambles in everything, from continents to baccarat, and I believe every English manufacturer and merchant whose business has been impaired by the McKinley bill will eagerly subscribe his name to the election of Mr. Cleveland as president.'"

### "Captain Thompson's Statement.

"Another gentleman to whom the reporter was referred is Captain Thompson, the London representative of the Equitable Assurance Society, and formerly in command of the steamship Brittannic.   He said :

"'Mr. Van Ingen is well known to me, and I know him to be eagerly working for Mr. Cleveland's election, because he thinks that his election would be greatly beneficial to the British manufacturing interests with which he is closely associated. He is a man who could put his hands deeply into his pockets, because he is very rich, and I have reason to believe he has done so, and I know he has induced a large number of English exporters and manufacturers to do likewise.

"'The feeling among the British business men is entirely in Mr. Cleveland's favor.   For instance, John Albert Bright, son of the late John Bright, said to me recently : 'I hope that Cleveland will be elected, because then I shall get some free ships into America.'"

### "More Proofs of the Scheme.

"An American merchant doing business in this city, who desires to have his name remain unknown unless his statement is questioned, said :

" ' It is very evident that Mr. Van Ingen is making great efforts to bring about Cleveland's election, and that he is raising a large amount of money for that purpose, as he would gain greatly by being enabled to flood the American market with cheap English and Continental cloth to be made into expensive American suits. At present there is not much advantage to be derived in importing even cheap woolen goods into the United States, for the American manufacturer is in a position to compete in that market, thanks to the McKinley tariff.' "

" ' Do you think a corruption fund has been provided by English merchants for Cleveland's election ?' asked the reporter.

" ' I am certain of it. In fact, I have reason to believe that it has existed for some time, although the English importers are naturally extremely reticent on the subject lest it should leak out and prove the means of Cleveland's overthrow instead of his election.' "

The articles published in the other papers are substantially the same as the foregoing.

The jury found a verdict for the plaintiff of $4,000.


*William Irwin* and *A. L. Pincoffs* for appellant. The court erred in denying the motions to dismiss the complaint and to direct a verdict for the defendant. Both these motions were based upon the following grounds : *First*, that the article complained of is not libelous as against the plaintiff, and, *second*, he is not indicated in the article. (Townshend on Slander & Libel [4th ed.], 629, 630 ; *People* v. *Parr*, 25 Wkly. Dig. 113 ; *James* v. *Rutlich*, 4 Coke, 17 ; Hawk Pl. Cr. Ch. 79, § 9 ; *Tyler* v. *Tillotson*, 2 Hill, 507 ; *Fleischmann* v. *Bennett*, 87 N. Y. 231 ; *Miller* v. *Maxwell*, 16 Wend. 16 ; *Sumner* v. *Buel*, 12 Johns. 475 ; 13 Am. & Eng. Ency. of Law, 434, 437 ; *Woodruff* v. *Bradstreet Co.*, 116 N. Y. 217.) The court erred in admitting in evidence copies of the *Morning Advertiser*, of the New York *Recorder* and of the New York *Press* of the date respectively of November 7, 1892, and this error was not cured by the direction of the

court that the jury was not to consider these articles in deter-
mining the questions as to whom the article complained of
referred to. (2 C. & P. 307; *Miller* v. *Maxwell,* 16
Wend. 14, 16; Odgers on Libel & Slander [Black. ed.],
235.) The court erred in permitting the plaintiff to tes-
tify as to what the lord chief justice of England said
regarding the publication in the settlement of the action
brought in the Court of Queen's Bench in England. (1
Greenl. on Ev. [14th ed.] §§ 82, 514; *Blair* v. *Flack,* 67
Hun, 648; 50 N. Y. S. R. 480; 141 N. Y. 53, 57; *Weymouth*
v. *Broadway S. A. R. R. Co.,* 2 Misc. Rep. 506; *Tousley*
v. *Barry,* 16 N. Y. 500; *Truax* v. *Slater,* 86 N. Y. 632;
*Bush* v. *Roberts,* 111 N. Y. 278; *Luby* v. *H. R. R. R.
Co.,* 17 N. Y. 131; *Cortland Co.* v. *Herkimer Co.,* 44 N.
Y. 22; *Clapper* v. *Town of Waterford,* 131 N. Y. 382,
390; *Murphy* v. *Marscheider,* 4 N. Y. Supp. 799; *Pringle*
v. *Woolworth,* 90 N. Y. 502.) The court erred in admitting
the testimony of the plaintiff as to the final order of the
English court. (*Momeyer* v. *N. J. S. & W. Co.,* 20 N. Y.
Supp. 814; *Kain* v. *Larkin,* 131 N. Y. 300; *Kearney* v.
*Mayor, etc.,* 92 N. Y. 621; *Simpson* v. *Dall,* 3 Wall. 475;
*Wheeler* v. *Britton,* 17 N. Y. Supp. 749; 137 N. Y. 628.)
The court erred in permitting the plaintiff to testify that
there was no other person than the plaintiff who is the
London head of a New York firm of cloth jobbers. (*Gut-
terman* v. *Liverpool, etc., S. Co.,* 83 N. Y. 359; *Rey-
nolds* v. *Robinson,* 64 N. Y. 595; *Link* v. *Sheldon,* 136 N.
Y. 9; *Matter of Snelling,* 136 N. Y. 518.) The court erred
in admitting testimony as to what cable was referred to in the
article, this being immaterial. (Best's Principles of Evi.
§§ 229–249; *Malcomson* v. *Clayton,* 13 Moore P. C. C. 18;
*Hinman* v. *Hare,* 5 N. Y. S. R. 510.) The court erred
in permitting the witness Willis to testify as to what he knew
about the plaintiff. (Greenl. on Evi. [14th ed.] § 51a.) The
court erred in admitting the testimony of the witnesses David
T. Leahy, a partner, and Walter H. Sykes, an employee of
the plaintiff. (Townshend on Slander & Libel [4th ed.],

§ 384; *Smart* v. *Blanchard*, 42 N. H. 137; *Barton* v. *Holmes*, 16 Iowa, 252; *Smith* v. *Myles*, 15 Vt. 245; *Wright* v. *Paige*, 36 Barb. 438; *Snell* v. *Snow*, 13 Metc. 278; *Harrison* v. *Berrington*, 8 Carr. & P. 137.) The court erred in leaving it to the jury to determine whether the article published by the defendant referred to or indicated the plaintiff, and also in charging in effect that the words contained in the defendant's articles are libelous as matters of law, provided the jury find they refer to the plaintiff. (*Miller* v. *Maxwell*, 16 Wend. 9; Townshend on Slander & Libel [4th ed.], 629, 630; *People* v. *Parr*, 25 N. Y. Wkly. Dig. 113; Hawk Pl. Cr. ch. 79, § 9; *Fleischmann* v. *Bennett*, 87 N. Y. 231.) The court erred in refusing to charge that unless the defendant was known on and prior to November 7, 1892, as the London head of a large New York firm of cloth jobbers, the verdict must be for the defendant, and that there is no evidence that the plaintiff was, on or prior to November 7, 1892, known as the London head of a large New York firm of cloth jobbers. (Townshend on Slander & Libel [4th ed.], § 375a; *Miller* v. *Maxwell*, 16 Wend. 16.) The court erred in refusing to charge that " there is evidence that the plaintiff was not known as ' the London head of a large New York firm of cloth jobbers' prior to the publication of the alleged libel on November 7, 1892," and that " it is necessary for the plaintiff to prove to the satisfaction of the jury that the plaintiff was known as ' the London head of a large New York firm of cloth jobbers' before they can find a verdict for the plaintiff." (Townshend on Slander & Libel [4th ed.], §§ 131, 375a; *Miller* v. *Maxwell*, 16 Wend. 16, 17.) The court erred in refusing to charge that it was necessary for the plaintiff to prove to the satisfaction of the jury that the plaintiff was the London head of a large New York firm of cloth jobbers before they can find a verdict for the plaintiff, and in charging in lieu thereof that it was necessary for the plaintiff to prove simply that he was " a London head of a large New York firm of cloth jobbers," etc. (Townshend on Slander & Libel [4th ed.], § 140; *Daines* v. *Hartley*, 3 Ex. 200; *Hayes* v. *Ball*, 72 N. Y. 420;

*Phillips* v. *Barber*, 7 Wend. 439; *Mayor, etc.,* v. *Lord,* 17 Wend. 296.) The court erred in refusing to charge the 7th and 8th written requests of the defendant, which were: "*Seventh.* That the publication of other similar articles in other papers immediately prior to the publication of the article complained of is a matter the jury must consider in mitigation of damages." "*Eighth.* That the fact that the same matter, substantially, was published extensively in the morning papers of the same day, is to be considered by the jury in mitigation of damages." (*Creevy* v. *Carr,* 7 Carr. & P. 64; *Lewis* v. *Walter,* 4 Barn. & Ald. 605; *Saunders* v. *Mills,* 6 Bing. 213; *Skinner* v. *Powers,* 1 Wend. 451; *Lothrop* v. *Adams,* 133 Mass. 471; Townshend on Slander & Libel [4th ed.], 675; *Howard* v. *Thompson,* 21 Wend. 319; *Romayne* v. *Duane,* 3 Wash. C. C. 246; Code Civ. Pro. § 508; *Bennett* v. *Matthews,* 64 Barb. 410; *Gilman* v. *Lowell,* 8 Wend. 573; *Lawler* v. *Earle,* 5 Allen [Mass.], 22; *Hamilton* v. *Eno,* 81 N. Y. 128.) The court erred in refusing to charge the defendant's 11th and 12th requests to charge, which were as follows: "*Eleventh.* That it is only for actual injury proved to the reputation of the plaintiff by the defendant's article, outside of and in addition to any damage already done to him by the publication in the morning papers that the plaintiff could recover." "*Twelfth.* That if no such additional damage was done to the plaintiff's reputation by the defendant's article the jury must find only nominal damages." (Folkard's Law of Slander & Libel [5th ed.], 336, 337; *Creevy* v. *Carr,* 7 Carr. & P. 64; *Saunders* v. *Mills,* 6 Bing. 213; *Skinner* v. *Powers,* 1 Wend. 451; *Lothrop* v. *Adams,* 133 Mass. 471; *Romayne* v. *Duane,* 3 Wash. C. C. 246; *Bush* v. *Prosser,* 11 N. Y. 354; *Wyatt* v. *Yore,* Holt N. P. 299–304; *Harrison* v. *Pearce,* 1 F. & F. 567; *Bergmann* v. *Jones,* 94 N. Y. 56.) The verdict was excessive and should be set aside on this ground. (*Turton* v. *N. Y. Recorder,* 3 Misc. Rep. 314.)

*Walter S. Logan* for respondent. There was no error in denying the motions to dismiss the complaint and to direct a

verdict for the defendant. (Penal Code, §§ 41, 242, 244; *Cooper* v. *Greeley*, 1 Den. 347, 359; *More* v. *Bennett*, 48 N. Y. 472, 476; *Cramer* v. *Riggs*, 17 Wend. 209; *Edsall* v. *Brooks*, 26 How. Pr. 431; *Bergmann* v. *Jonés*, 94 N. Y. 51; L. 1842, ch. 130; *King* v. *Root*, 4 Wend. 113; *Thorn* v. *Moser*, 1 Den. 488; *Howard* v. *Sexton*, 4 N. Y. 157; *Bush* v. *Prosser*, 11 N. Y. 347; *Hatch* v. *Potter*, 7 Ill. 725; *Rearick* v. *Wilcox*, 81 Ill. 77; *Gilman* v. *Lowell*, 8 Wend. 573, 578; *Sanderson* v. *Caldwell*, 45 N. Y. 398, 403; *Terwilliger* v. *Wands*, 17 N. Y. 49, 54; *Bourke* v. *Warren*, 2 Carr. & P. 307; *Ruckman* v. *Delavan*, 25 Wend. 186; *Maybee* v. *Fisk*, 42 Barb. 326, 330; *Byrnes* v. *Matthews*, 12 N. Y. S. R. 75, 79; *Byers* v. *Martin*, 2 Col. 605, 608; *Goodrich* v. *Woolcott*, 3 Cow. 231; 5 Cow. 714.) The court did not err in permitting the plaintiff to testify in reference to the proceedings in open court at the time of the English trial. (Phil. on Ev. *415; *Rouse* v. *Whited*, 25 N. Y. 170; *Starin* v. *People*, 45 N. Y. 333, 340; *Platner* v. *Platner*, 78 N. Y. 90, 103; *People* v. *Beach*, 87 N. Y. 508, 512; *Grattan* v. *Met. L. Ins. Co.*, 92 N. Y. 274, 284.) The verdict was not against the weight of evidence, and it was not error to deny the motion for a new trial on that ground. (*Warner* v. *P. P. Co.*, 132 N. Y. 181.) The verdict was not excessive. The libel was an atrocious one, and there was no excuse whatever for it. (*Holmes* v. *Jones*, 147 N. Y. 59.)

Martin, J. The decision of this case turns upon the question of the admissibility of evidence of the previous publication of articles by the New York morning papers, which mentioned the plaintiff as the guilty party, and who, in the publication by the defendant which related to the same subject, was described as " the London head of a New York firm of cloth jobbers." Was this evidence admissible to show that the plaintiff was the person referred to in the defendant's article, and that it would be so understood by persons reading it? The defendant's publication was in the evening of the day on which the articles in the papers mentioned were published,

49

and that it referred to the same subject is obvious. The managing editor of the defendant testified that he read the article in the defendant's paper before it was published. He also testified that he referred in that article to whatever cables, or articles purporting to be cables, appeared in the morning papers admitted in evidence. His testimony also shows that he had read the papers containing this account, he knew to whom they referred, and, with that knowledge, published the article in question. Thus, this testimony disclosed the actual circumstances under which the libel was published. It showed that the person who was instrumental in its publication knew and intended that it should refer to the plaintiff, and that there had been a publication of the transaction by other papers which was such that any person having read them would at once know to whom the article published by the defendant applied. It seems to be well settled that where a libel does not name the plaintiff he may give evidence of all the surrounding circumstances and other extraneous facts which will explain and point out the person to whom the allusion applies. (Odgers on Libel and Slander, p. 467 ; Newell on Defamation, p. 767.) That rule is established by the adjudicated cases and text writers as well. Hence, the important question is whether evidence of the publications by the morning papers of articles relating to the same subject was a circumstance which was admissible to show that the publication by the defendant was intended to apply to the plaintiff, and would be so understood by a reading public. That those articles would produce that effect, and produce the same injury as if the plaintiff had been named by the defendant with those who had read the previous publication is manifest. The evidence of the defendant's managing editor shows that the basis of the defendant's publication was the articles which were introduced in evidence. To determine the effect of the defendant's article and to whom it applied, it would seem proper to show the condition of the public mind, the information the public possessed upon the subject of the article, and the consequent inference which it would readily draw from reading it. As

bearing upon that subject, the plaintiff was permitted to show that at least three public newspapers, which had a large and general circulation in the same city, had previously and on the morning of the same day published an account of the supposed transaction in which they mentioned the plaintiff as the person who was guilty of the act alleged. After the details of this transaction had been made public and the name of the plaintiff given, the defendant, with a knowledge of those publications and that the plaintiff had been identified as the guilty person with a view of communicating the same information to its readers, published its article. Under these circumstances, it seems to me that proof of the condition of the public mind and the means of information the public had was admissible as attendant circumstances which indicated that the defendant's article referred to the plaintiff.

I am unable to satisfy myself that the plaintiff had not the right to show all the circumstances existing at the time, including the state of the public mind, the knowledge it must have acquired from previous publications, and any other extraneous matter which would tend to point out the person to whom the defendant's article was intended to apply. Can it be where two newspapers are published in the same locality, one irresponsible and the other responsible, and the former has published an article severely reflecting upon a party it named, that the other may follow by a publication of the same transaction, omitting the name, and the party injured will, in an action against the latter, be prohibited from introducing the publication by the former as a circumstance showing the state of the public mind, and how the second publication would be understood by persons reading it? I think not. I cannot believe that a newpaper can publish a libel which its editor knew at the time related to a particular individual, and would be· so understood by the public by reason of a former publication, and then properly have the publication excluded, although it would show that the community would recognize the plaintiff as the person alluded to in its article. In other words, it seems to me that a defendant cannot publish a libel of another

and shield himself by not disclosing the name of the person to whom it was intended to refer, when he knows and understands that by reason of former publications the public mind is in a condition where it would necessarily understand the article as applying to him alone.

I am also disposed to think that these articles were admissible upon still another ground. It will be seen by reference to the record that they were first proved by the defendant's counsel, who, while cross-examining the plaintiff, elicited from him the fact that articles relating to the same subject were previously published in the Press, the Recorder and the Commercial, and were circulated upon the morning of the seventh of November. The defendant attempted to use those publications for the purpose of convincing the jury that all the injury the plaintiff's reputation had suffered was caused by the publication of the articles contained in those papers. After making that proof, could the defendant properly object to the admission of the articles themselves? Were they not admissible to enable the jury to determine how far that claim of the defendant was sustained? I am disposed to think that the defendant's attorney, by his cross-examination, opened the door for the introduction of the articles to which he referred, and, hence, that his objection to them as immaterial was properly overruled.

These views lead to an affirmance of the judgment below.

BARTLETT, J. (dissenting). . The important question in this case is whether the alleged libel referred to the plaintiff. The article published by the defendant is libelous *per se,* and if the plaintiff succeeded in proving that it was written of and concerning himself, he was entitled to recover.

I am of opinion that the jury were permitted to consider incompetent evidence in reaching their verdict, which must have been highly prejudicial to the defendant.

The article in question charges that " the London head of a large New York firm of cloth jobbers is reported as the leader of the movement to get together and send to America

nearly half a million of British gold with which to push the course of the anti-tariff democracy and its candidate for the Presidency," etc.

The article speaks of this and other information as having "just been cabled over."

In order to establish that the plaintiff was referred to in this publication, it was proved that he was the head of a large New York firm of cloth jobbers, and there was some evidence tending to show that he was the London head of a branch house of his firm in the latter city; also that there were no other firms of New York cloth jobbers who had London branches with London heads.

The inference sought to be drawn from this line of proof was, that the friends and business acquaintances of plaintiff would at once, upon reading the article, recognize the fact that he was charged with raising a corruption fund in England to buy votes in a presidential election about to be held in the United States.

The plaintiff sought to make this slight identification complete by offering in evidence articles published in other papers.

The "Mail and Express," published by defendant, in the city of New York, is an evening paper, and it is charged that the libel was published in it on Monday, November 7th, 1892, the day before election.

On the morning of that day three New York papers published articles on the same general subject involved in the alleged libel purporting to have been received by cable that day from London, in which the plaintiff was referred to by name as at the head of the movement in London to raise a fund to influence the approaching election.

The learned counsel for the plaintiff states that he offered these articles for the purpose of establishing the plaintiff's identity, and to show that the cable dispatches in the morning papers related to the publication in the defendant's paper the next evening, and that the latter was read by citizens in the light of the morning statements, and that the jury could read them in the same way. There was no attempt on the part of

the plaintiff to prove that any friend or business acquaintance of the plaintiff had read the morning and evening publications, and thereby spelled out a libel charging plaintiff with a crime, as such evidence would have clearly been incompetent.

In the case of *Bourke* v. *Warren* (2 Car. & Payne, 307) it was held in the Court of King's Bench, " that, if in a libel, asterisks be put instead of the name of the party libeled, to make it actionable, it is sufficient that the party should be so designated that those who know the plaintiff may understand that he is the person meant; and it is not necessary that all the world should understand it. But if witnesses who state that they understand that the plaintiff is the person, also say that they were enabled so to understand by the perusal of another libel, with which the defendant had no concern, their evidence ought to be laid out of the case."

This rule is founded in reason, as it would be most unjust that a defendant in a libel suit should be confronted by independent libels he had not published, and subjected to the peril of submitting them to the jury.

These articles were also received notwithstanding a further objection interposed by the defendant, to the effect that they contained interviews in London with ex-Congressman Ochiltree and Captain Thompson, the London representative of the Equitable Assurance Society. There were thus introduced statements commenting on plaintiff's alleged conduct, calculated to prejudice the jury and intensify the supposed libel published by the defendant.

These statements or interviews contained direct attacks and charges upon plaintiff by name, and must have confused and influenced the jury when considering the article involved in this action.

We have admitted in evidence not only three distinct libels published in newspapers over which defendant had no control, but the libelous statements of two individuals, never printed by the defendant, in which the plaintiff is attacked personally.

This evidence was purely hearsay, and the charge of the

trial judge, in substance, that these articles must not be considered by the jury in determining the question whether plaintiff was referred to in the article published by defendant did not cure the error.

The evidence remained in the record, and it needs no argument to show that its effect upon the jury was very damaging to defendant. The trial judge did not charge the jury that they were to disregard this evidence absolutely and treat it as withdrawn, but limited it to the point whether the plaintiff was referred to in the alleged libel.

The learned General Term referred on this point to *Holmes* v. *Moffat* (120 N. Y. 159), a case decided by the Second Division of this court. The facts there presented were quite different from those in the case at bar.

Judge PARKER pointed out that the court in the charge referring to the improper evidence, said : "I withdraw it from your consideration, as I do not believe it to be proper or material evidence. * * * I do not think my attention was directed to it with that degree of care that it should have been ; and, therefore, it got in." This was a complete withdrawal of the improper evidence from the jury, and the case when in this court was properly decided.

It is assumed that the jury will follow the instructions of the court, and it is the well-settled general rule that the proper remedy is to ask the court to instruct the jury to disregard the evidence. (*Marks* v. *King*, 64 N. Y. 628 ; *Platner* v. *Platner*, 78 N. Y. 90.) It is also competent for the court, in its discretion, to strike out the evidence of its own motion. (*Gall* v. *Gall*, 114 N. Y. 109.) In the trial of a cause it frequently happens that improper evidence is admitted for the reason that at the moment the attention of the court or counsel is not called to its character. It would be a strict and unreasonable rule if the error could not be cured by motion to strike out, or for instructions that the jury disregard it.

The case at bar presents no such situation.

With the newspaper articles and London interviews stricken out, it is a question of considerable doubt whether, upon the

remaining evidence, the jury would find that the alleged libel referred to plaintiff.

It is impossible to say that the verdict was not affected by the incompetent evidence, even if it were not wholly based upon it.

The case of *Erben* v. *Lorillard* (19 N. Y. 299) is very much in point.

Judge DENIO, after pointing out that an improper measure of damages had been established based upon evidence of the value of a lease, said : " Where the jury were finally told to disregard what had been proved respecting the lease, they had scarcely any evidence before them upon which to assess damages against the defendant ; and it is not surprising that they were unable to dismiss from their minds the consideration that the plaintiff had been wrongfully deprived of a valuable lease, or to avoid making up to him at least a part of his loss."

Judge GROVER said in the same case : " It would be vain to observe the rules prescribed by law to secure an impartial jury, if their minds are to be subjected to the influence of illegal evidence after they are impaneled. It does not follow that impressions thus obtained will have no effect, although the judge directs them to disregard the evidence."

There are other points urged on behalf of the appellant, but I do not deem it necessary to consider them. I cannot agree that the articles published in the morning papers were first proved by defendant in cross-examination of plaintiff. In my opinion this cross-examination bears no such construction. The articles were first offered and read in evidence by plaintiff, and his counsel makes no claim to the contrary.

The judgment and order should be reversed and a new trial ordered, with costs to abide the event.

PARKER, Ch. J., GRAY and O'BRIEN, JJ., concur with MARTIN, J., for affirmance ; HAIGHT and VANN, JJ., concur with BARTLETT, J., for reversal.

Judgment affirmed.