Sollitt v. Moore.

---

### Oliver Sollitt v. John M. Moore.

1. INSTRUCTIONS—*Not Limited to the Evidence Are Erroneous.*—An instruction which mentions the social standing of the defendant as an element of damages where there is no evidence of defendant's social standing is erroneous.

2. SLANDER—*Words Actionable Per Se May be Explained by Surrounding Circumstances.*—The malice which the law implies from the use of words actionable *per se* may be explained and rebutted by circumstances. It may also be shown that the words were used with reference to a known act, and were so understood by those present, and that such was not, in point of law, a felony.

**Action for Slander.**—Appeal from the Superior Court of Cook County; the Hon. PHILIP STEIN, Judge presiding. Heard in the Branch Appellate Court at the March term, 1902. Reversed and remanded. Opinion filed April 14, 1903.

August 7, 1899, George M. Knapp, John W. Miller and Minnie M. Miller, his wife, conveyed by warranty deed to appellant, an undivided one-half interest in certain real estate on the shore of Fox Lake in Lake county, Illinois, commonly known as the " Antlers."

September 14, 1899, George M. Knapp conveyed to Sollitt his right in an undivided one-half interest in certain chattels and personal property situated on and being used

in connection with said real estate; said property consisting of a steam launch, tools, row boats, dining room tables, linen, dining-room utensils and other furniture on the place, which were being used in connection with the real property, which was used as a gun club or hotel.

September 14th, George M. Knapp, by quit-claim deed, conveyed to Sollitt all his interest in the real estate above mentioned, which, together with the conveyance above mentioned, gave Sollitt a three-fourths interest in the real estate and a half interest in the personal property of the " Antlers."

September 26th, an agreement was made between Sollitt and John W. Miller, by which Sollitt was to purchase the one-fourth interest of Miller in the said real estate, building and contents thereof, at which time Sollitt paid Miller $50 and received a receipt therefor. Thereafter in pursuance of this agreement, a deed was made by Miller and wife to Sollitt of their interest in said real estate. This deed was immediately sent by Sollitt to the recorder's office at Waukegan in Lake county and was recorded October 5th, at three o'clock P. M.

At the time of the obtaining of the last mentioned deed from Miller and wife, Sollitt gave to Mrs. Miller a check for $350.

Prior to receiving these conveyances and paying the money, Sollitt had examined an abstract of title to the property, which did not show any title in John M. Moore, appellee. After Sollitt had received the aforementioned conveyance and had recorded his deeds, he received a letter from the recorder of Lake county, and an abstract of title, showing that a deed from John W. Miller and Minnie M., his wife, to John Moore of Chicago, of the property known as the " Antlers," dated September 14, 1899, was recorded in Lake county, October 4, 1899. The record, October 4, 1899, being the date of the deed by Miller and wife made to him, Sollitt, for which he, Sollitt, had paid to them the sum of $400. This letter from the recorder was received by Sollitt about October 13th.

October 15th, Sollitt went to see Moore, and met him in the dining-room of the "Antlers," where he was taking supper with Mrs. Miller and her daughter.   Sollitt said to Mr. Miller, addressing him as Dr. Miller, "I have a letter from the recorder at Waukegan, saying this property is in your name, and I want an explanation."   Sollitt then began to read an abstract from the recorder as to the deed on record at Waukegan.   After he had finished, appellee said to him, "Mr. Sollitt, I have signed and acknowledged on the 20th of September a deed to Mrs. Miller at James Conlon's office in Oakland Music Hall, Chicago.   I don't know anything about the matter you are talking about." To which Sollitt replied, "You and Miller have conspired to defraud me out of this property, and if you do not go down to my office to-morrow morning at ten o'clock, I will have you arrested for fraud.   I will send you, your sister and Miller up for ten years."   To which appellee replied, "I can stand this no longer; get out of here and get out quickly."   A Mr. Garvey, a witness for appellant, testified that at this time Mr. Miller said to Mr. Sollitt, "Your deed is no good; Mr. Miller's name does not appear on the deed first."   Mr. Garvey also testified that the next morning he went over to the house, the "Antlers," with Mr. Sollitt; that he and Sollitt went to the front door and rapped two or three times.   There was no answer.   They went to the back door, rapped two or three times.   There was no answer; that they went to the front of the house; that a front window was down at the bottom about half way; that he, Garvey, went in through the window; that about half way across the room, a woman came from behind a partition with a revolver and said, "Hold your hands, I want you to understand you have no right in this house. I will shoot you full of holes;" that a Mr. Smith was behind him, Garvey; that he and Smith got out; that Mr. Miller came up a little later; that the woman said, "I have a notion to shoot you anyway; that Mr. Miller said, "Plug them full of holes, Min," and "What does this mean?"   To which Sollitt said, "It means I have taken posses-

sion." That Miller ordered Sollitt off the place; that Miller said he had no right there. Sollitt said that he had. That Miller said, "Knapp had no business selling out."

Dr. Fred Bassett, a dentist, testified that October 23, 1899, Mr. Sollitt came into his drug store at Fortieth and Cottage Grove avenue, in Chicago, and asked him if he knew Dr. Moore; that he, Bassett, replied that he did; that Sollitt then asked if he had a good reputation; to which he, Bassett, replied that he had; that after their conversation Sollitt said that Dr. Moore and his brother-in-law had flim-flammed him out of his property at Fox Lake; that they were not alone satisfied with that, but were stealing and carrying off everything about the place; that Dr. Moore stood a good chance of going to the penitentiary for ten years; that he, Sollitt, was going after him as hard as he could; that Dr. Moore did not look to be an honest man.

John W. Miller testified, in respect to the attempt by Garvey and Smith, at Sollitt's instance, to get into the house, that Garvey got into the house and Smith was going to follow him, when Mrs. Miller came to the window with an empty gun; that Garvey and Smith rushed out in a hurry; that he, Miller, then said, "Mr. Sollitt, there is no necessity for any work of this kind here. Everything is straight as far as I am concerned. This property was sold by myself and wife to Dr. Moore and by Dr. Moore to my wife;" and that October 4th the deed was made; that it was straight and legitimate so far as he knew.

Mr. Sollitt testified that after being so told by Miller, he wrote immediately to the recorder at Waukegan; that he investigated the records and found that no such deed had been recorded.

On Friday or Saturday, after the attempt by Garvey and Smith to get into the "Antlers," as told and directed by Sollitt, and there being driven out by Mrs. Miller with a revolver, Mr. Sollitt received the following letter:

                                    "FRIDAY.
MR. SOLLITT:
    DEAR SIR.—If you can not wait any longer than 5 P. M.

to-day to straighten out errors, then by all means have me, my wife and the doctor arrested, as it would help us in a damage suit. In the meantime call up Mr. Wagner and he can satisfy you as to how the mistake occurred. I will be in to-morrow (Saturday). The error can easily be rectified, but I can not get in town to-day, as Mrs. M. is ill.

Yours truly,

J. W. MILLER."

Mr. Thomas B. Brougham testified that October 23d, Mr. Sollitt, and Mr. Knight, a lawyer, came to his office about two o'clock in the afternoon. Mr. John W. Miller had before this told Mr. Sollitt that Knight and Wagner had been his attorneys. Brougham testified Mr. Knight said to him, "I have come here with Mr. Sollitt in relation to Miller's matter, the deal at Fox Lake." That Miller had said that he should "come" there as a messenger in order to explain matters; that Knight said, "Here is a deed, which I am informed by Mr. Wagner has been lying in our office;" that Mr. Wagner had not then gotten his fees from Miller and wanted security therefor; that the deed had been held by him for the purpose of getting his fees;" that he, Brougham, then said, "Mr. Knight, are you talking from any personal knowledge?" To which Mr. Knight replied, "No, I am not; all this I have been told, and from what I have been told, I believe it is true;" that he, Brougham, then took the deed and looked at it, and found there were many defects in it; it was not dated and not stamped; that he, Brougham, then said, "Mr. Knight, in the first place it seems to me here is a deed that is held up in your office by Mr. Wagner; there is a question whether it was ever delivered; in the second place I do not consider it a good deed at all. It does not possess the elements of a good deed. You are doubtless aware, in view of the law, a deed does not convey title until it is stamped, and is not entitled to be recorded. They would not consider this a good deed at all." To which Knight replied, "I noticed there several defects like that." He, Brougham, then said, "I could not advise Mr. Sollitt to take that deed; Mr. Knight, this is a matter that looks suspicious." That Mr.

Sollitt laid the matter before him, Brougham, and asked his opinion about it; that he told Sollitt that the circumstances were suspicious; that he would advise him, Sollitt, to see those people; that if they were honest, there was no question but they would assist him to fix up the title; that Mr. Knight said, " I think upon payment of fees, we could deliver up the deed." To which he, Brougham, replied, " I do not consider this a deed; we would not accept it, because it is not a good deed in law, until it is entitled to be recorded." To which Knight replied, " I will admit this distinction."

At this conversation, Sollitt testified that Knight said that two dollars had been left with him for recording and stamping the deed; that after this conversation at the office of Knight, he went to Fortieth street and saw Mr. Bassett.

It appears that when Mr. Sollitt went, after the conveyance to him of the " Antlers," to take possession, he found that a boat had been taken away, and he offered, but was not permitted by the court, to show that considerable other personal property which he claimed was purchased and paid for by him, had also been taken away, without his knowledge or consent.

It appeared that Sollitt had instituted criminal proceedings against John W. Miller for fraudulently selling land after having sold the place to another party, and that he was in jail, at Waukegan, October 23d.

Knight testified that at the conversation between him, Brougham and Sollitt, he said to them, " I would like to hold the deed as a sort of security for the $30 balance due us. If it is a question of a man's liberty, or my possession of the deed for $30 security, I will waive my security and you can have the deed." That they did not take it and he brought it back.

Appellee, Moore, having brought against Sollitt an action for slander, Sollitt filed a plea admitting the speaking of the words charged in the declaration and justifying the speaking of them by setting forth the circumstances of his discovery of the making and recording by Miller and wife

of the deed to Moore, prior to the making by them of the deed to him, Sollitt. That upon him informing appellee of what he had discovered, he and Miller refused to make any explanation, but became very abusive and ordered him away from the property and out of the house. Also setting up the taking away from said premises by Mr. and Mrs. Miller of a boat and certain other personal property claimed to have been purchased and paid for him, Sollitt.

Upon the trial, the jury returned a verdict for the plaintiff for $10,000, from which the plaintiff remitted the sum of $8,000 and judgment against the defendant was entered for $2,000.

ALTGELD, DARROW & THOMPSON, attorneys for appellant.

LANGWORTHY & RAYMOND, attorneys for appellee.

MR. PRESIDING JUSTICE WATERMAN delivered the opinion of the court.

Among the instructions given at the instance of the plaintiff was one telling the jury that in fixing the amount of the plaintiff's damages, they might take into consideration in connection with all the other evidence in the case, the pecuniary and social standing of the defendant and the character and standing of the plaintiff, so far as those have been shown by the evidence.

There was evidence as to the pecuniary standing of the defendant, but none as to his social standing. The instruction was therefore in that regard, erroneous.

The evidence as to the pecuniary standing of appellant was that he was worth $50,000.

There was no evidence tending to show that appellee had, by reason of the words spoken, sustained mental suffering or injury to his reputation. Instruction number one was misleading in containing an intimation that proof of such suffering and injury had been introduced.

Appellant should have been permitted to show that which prior to the speaking of the words he had ascertained or been informed, and honestly believed, as to the taking

away from the "Antlers" by appellee of personal property belonging to him, appellant.

As is said in Welker v. Butler, 15 Ill. App. 209–211–212, "While the law implies malice from the use of words actionable *per se*, yet this implication may be explained and rebutted by circumstances. Words standing alone may import malice and indicate a wicked intent. Surround them with the circumstances under which they were spoken and the malice disappears. It may also be shown that the words were used with reference to a known act, and were so understood by those present, and that such was not, in point of law, a felony." Zuckerman v. Sonnenschein, 62 Ill. 115; McKee v. Ingalls, 4 Scam. 30; Ayers v. Grider, 15 Ill. 37–38; Townsend on Slander, 3d Ed., Sec. 361.

The circumstances under which the slanderous words were uttered, were such that a verdict for $10,000 therefor, shows that the jury, in what they did, were either actuated by passion or prejudice, or entirely misunderstood the nature of the cause they were trying and their duty in respect thereto. It is not strange that one should become alarmed and excited who, having examined an abstract and found that three conveyances made to him would convey to him a proper title to the property, should, having received three deeds and paid $400 in money for the last conveyance, find that the parties making the last deed had, the day prior thereto, executed, and there had been recorded, a deed by them to a third party, of which he, the purchaser, was ignorant until ten days after he had parted with his money. Such circumstances would tend to alarm a reasonable man and induce him to believe that he had been intentionally swindled. And when, eleven days after the purchase, Mr. Sollitt, as a reasonable man, went to the premises and found in possession thereof, Mr. Miller and wife and Doctor Moore, to whom Miller and wife had conveyed the premises one day prior to executing a deed to and receiving from him, Sollitt, $400, he had reason to be indignant and excited. Likewise, when Mr. Sollitt was then and there told by Miller that the deed he and his wife had made to him,

Sollitt, "was no good," certainly the suspicions of a reason-
able man would have been strong, and it would not be
strange if he uttered language not used in the best society.
So, also, when the next morning he went with two persons,
whom he had employed, and after knocking at the rear of
the house and the front, with no response, his employes
attempted to get in at an open window and were driven
out with a revolver by Mrs. Miller, one of the parties by
whom he had apparently been swindled, the check for $350
having been made to the order of Mrs. Miller and the money
thereon drawn the day after it was made, he might have
well thought that he had fallen into the hands of and been
dealing with very dishonest people. Especially so, when
Mr. Miller came running up to his wife, crying out to her,
"Shoot them full of holes." Nor did the reiterated utter-
ances of Mr. Miller, on that morning, telling Mr. Sollitt
that he had no right there, have a tendency to allay Mr.
Sollitt's fears and induce him to proceed with that calmness
and deliberation and to make use of that polite, gentle-
manly and amiable demeanor, which persons should exercise
under all circumstances. Nor did what occurred on Octo-
ber 23d have a tendency to greatly re-assure Mr. Sollitt
and make him think he had been fairly dealt with. He
was then, by the attorney of Mr. Miller, shown a defective
deed from John M. Miller and Minnie M. Miller to appellee,
upon which the attorney claimed, but offered to waive, a
lien of $30, which deed Mr. Sollitt's attorney advised him
not to accept.

This conveyance appears to have been recorded in Lake
county on the 26th day of October, twenty-two days after
the making and twenty-one days after the recording of the
deed from Miller and wife to Sollitt. Whether there was
originally an intention upon the part of Miller and wife to
swindle Mr. Sollitt out of his $400, as would appear from
the making and recording of the deed to Moore, without
any apparent honest purpose, and as further appears from
the testimony as to the conduct of Mr. and Mrs. Miller
when Sollitt made known to them and Mr. Moore his dis-

covery of the existence and recording of the deed to Moore; and their conduct, also, when he, Sollitt, the next day attempted to take possession of the premises he had bought and paid for; or whether such deed was made for some unknown and as yet unsuspected purpose, and, by some mistake upon the part of Miller's attorneys, was not recorded; or whether, as his attorney stated, it had been held because of a lien of $30 thereon; at all events, Mr. Sollitt was in no way or wise responsible for the very suspicious circumstances presented, and ought not to be mulcted in a large sum for his natural indignation, or, in the absence of evidence showing actual damage, made to pay a great sum of money, although he made use of ungentlemanly language and charged that upon Mr. Moore of which, as a matter of fact, he was innocent.

The judgment of the Superior Court is reversed and the cause remanded.