## Angeline M. Beeson, Appellee, v. The H. W. Gossard Com= pany, Appellant.

## Gen. No. 16,025.

1. SLANDER AND LIBEL—*how question of character of publication determined.* In an action for libel it is always a question of law for the court, in the first instance, to determine whether or not the proved publication is libelous. Where the whole publication is susceptible of only one meaning and is libelous *per se*, it is the duty of the court to instruct the jury that the publication is actionable, if made, and no evidence of a different intent is admissible in such case to prove the defendant's innocence. It is also the province of the court to determine whether the language of the alleged libel is ambiguous, or double in meaning, one of which is libelous. In determining whether the alleged libel is double in meaning, one of which is libelous, the court must not separate it into parts, and construe each part separately, but must construe each part of the alleged libel in connection with all the rest of it. When the court has so determined that it will bear such double meaning, it is then the province of the jury to determine in which sense the language was used, and for such determination the whole publication should go to the jury.

2. SLANDER AND LIBEL—*when malice implied.* From the publishing or speaking of actionable words, malice is implied, which will justify the assessment of exemplary damages.

3. SLANDER AND LIBEL—*what considered in determining actionable character.* When the meaning of slanderous words spoken is made doubtful by reason of other words used at the same time, or in the same conversation, everything said in connection with the slanderous words must be considered in determining if the words were slanderous.

4. SLANDER AND LIBEL—*how intent may be shown.* If the intent of the defendant in an action for slander or libel be doubtful the witnesses may be asked their opinion as to the intent of the defendant. The opin-

ions given are not conclusive upon the jury, but such testimony is admissible as tending to show what meaning hearers of common understanding would and did ascribe to the alleged libelous matter.

5. INSTRUCTIONS—*when upon damages in action for libel erroneous.* An instruction in such an action is vicious which tells the jury that they may assess against the defendant such damages as the jury "believe the defendant ought to pay" under all the evidence in the case instead of closing with the proper conclusion "such damages, if any, as you shall find from all the evidence in the case, that she is entitled to recover against the defendant."

6. INSTRUCTIONS—*when upon damages in action for libel erroneous.* An instruction which virtually submits to the jury the question of the pecuniary ability of the defendant in determining the amount of the damages to be awarded, is erroneous in the absence of any evidence as to the pecuniary worth of the defendant.

7. INSTRUCTIONS—*effect of failure to define malice in action of libel.* In an action of libel it is not error for the court to fail to define malice—especially malice in fact.

8. DAMAGES—*what not essential to recovery of exemplary.* Express malice, or malice in fact, is not necessary to authorize exemplary damages in an action of libel. Proof of express malice may be made in any libel case to enhance the plaintiff's damages, and the defendant may offer proof showing the absence of express malice in mitigation of damages, but not as barring the right of the plaintiff to recover exemplary damages.

Action for libel. Appeal from the Superior Court of Cook county; the HON. WILLARD M. McEWEN, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1909. Reversed and remanded. Opinion filed February 21, 1912.

**Statement by the Court.** In this action for libel Angeline M. Beeson, appellee, recovered a judgment in the sum of $5,000 against The H. W. Gossard Company, appellant, a corporation and manufacturer and dealer in women's corsets. The declaration charges, in substance, that appellee had been a resident of Chicago for thirteen years and for many years had been engaged in administering treatments to invalids under direction of their physicians, having prepared herself therefor by a course of study at various medical institutions, and that she had enjoyed the friendship and patronage of the leading medical practition-

ers of Chicago; that appellant, with its principal store and office in Chicago, had employed appellee to attend an exhibit of its corsets at the annual convention of the American Medical Association, an organization of physicians and surgeons residing in different parts of the United States, held in Chicago on the 2nd to the 5th days of June, 1908, and there to lecture and explain to the attending physicians the hygienic and therapeutic merits and uses of such corsets; that in pursuance of such employment she did attend said exhibit and so explained and demonstrated the uses of said corsets in the treatment of diseases, by oral lectures illustrated by another woman employed by appellant and acting as model; that appellant, June 25, 1908, published in the form of a printed circular of and concerning appellee a certain scandalous, malicious and defamatory libel, containing certain false, scandalous, malicious and defamatory matter which purported to be an account of the conduct of appellee at. and of certain happenings in connection with, the said corset exhibit; that appellant had sent said circular by mail to a large number of physicians in different parts of the United States, whereby appellee had been greatly injured in her good name, credit and reputation and brought into scandal and disgrace, and had been shunned and avoided by divers persons. and otherwise injured. The alleged false, scandalous and defamatory circular with proper innuendoes is set forth in the declaration *in haec verba.* The said circular, with the innuendoes omitted, reads as follows:

"RECORD-HERALD.

Morning, June 4, 1908. Chicago

### FIE! DOCTORS NAUGHTY

Gaze on Shapely Corset Model
Until Wives Cause Her
To be Exiled.

CURVES SHOWN IN ARMORY.

## Living Venus in a Knit-Top-Petticoat and Girdle Cynosure at Medical Convention.

"Fie on the naughty corset model and fie on the peeping doctors!"

Mrs. A. M. Beeson, a demonstrator of girdle appliances, is the model. Thousands of members of the American Medical Association now in session are the peepers. The wives of the medical men are the criers of "Fie!"

When the exhibit in connection with the medical convention opened at the Armory last Tuesday the wives of the visiting doctors noticed that their husbands kept tugging them toward one part of the big hall, where a delighted circle of men were gathered. There stood a living Venus, girdling and ungirdling herself with a modern whalebone, steel and silk combination.

Mrs. Beeson was the Venus and the doctors' wives present declared she had little more raiment on than had her equally lovely predecessor when she arose from the mythological waves a few years ago.

"Ah!" cried the medical men, and their eyes flashed.

"Oh!" sniffed the medical men's wives, and their eyes flashed, too.

WIVES BECOME PETULANT.

"Come away! Come away!" urged the wives impatiently. "The exhibition is indecent. This is no place for you. She ought to be ashamed."

"Looks good to me," muttered a meek-looking little doctor as his amazon helpmeet whisked him along. Then he got indignant enough to speak up in protest.

"Why, there's nothing indecent about that corset demonstration," he insisted. "Look at these charts on the walls. They've got outlines of things belong-

ing to the human body that you couldn't even find in a cayenne pepper artist's studio. Look at those jars. They've got things on exhibition in them that I never saw in a hospital."

"Those charts and those things in the jars are not alive," said his wife significantly.

Then the doctors' wives got busy. They went to the ladies' committee, who had arranged the ladies' end of the convention programme. The committee, headed by Mrs. Albert J. Ochsner, went to Manager Braun. They got him in motion at once. He descended upon Venus.

"I'm afraid you'll have to modify your demonstration somewhat" said he to Mrs. Beeson, with a glance of lingering and admiring character at the corset.

"I also am a lady," said Mrs. Beeson, "but if you desire to seclude the exhibit we'll put up a screen."

So the screen was put up. To the dismay of many of the doctors' wives it was noticed that the screen arrangement tickled their husbands most to death.

#### CORSET STRINGS BREAK.

Yesterday at 10 a. m. the strings of the corset storm broke again. The ladies' committee insisted that the entire exhibit on the living model be stopped at once. It was so ordered and so done.

Then the corset company brought down a wax figure and demonstrated on that. Immediately the doctors altered their trail through the hall, sniffing with disgust as they walked by the inanimate Venus. The star glory of the exhibition had departed.

"There was nothing at all objectionable in our exhibit," said H. P. Junkins, manager for the H. W. Gossard Corset Company. "When our corset is laced on the living woman it demonstrates by the manner in which it encircles the waist and enfolds the abdominal cavity that it cannot hurt. The living body moves beneath the corset's curves. How can you show this on a wax figure?

"To-morrow morning at the Second Presbyterian Church Dr. A. Ernest Gallant of New York will de-

liver an address on the corset as a remedy for movable kidney and other troubles. I expect to demonstrate with Mrs. Beeson.

"Mrs. Beeson had on, when she demonstrated our corset, a knitted top petticoat. It is tight fitting, of course, being put on and taken off by stretching. It showed the"

The defendant pleaded only the general issue.

On the trial plaintiff put in evidence two printed circulars identified as exhibits "A" and "B." Exhibit "A" consists of a fac simile reproduction, in parallel columns on the same sheet, of two newspaper clippings, one from the Inter Ocean and the other from the Record-Herald, newspapers of date, June 4, 1908, and both purporting to give an account of happenings at said corset exhibition. The clipping from the Record-Herald is the article set forth in appellee's declaration as the alleged libel. The clipping from the Inter Ocean does not name nor in any wise refer to appellee; but its language describing the happenings at said corset exhibit is similar in character to that in the alleged libel, except that it names as the corset model a certain Miss Clarkson. The clipping from the Inter Ocean contained also at the top of the article a purported picture of the corset model, Miss Clarkson, as she appeared at the corset exhibition, and she is further portrayed by the Inter Ocean article in the following language:

"Hidden behind curtains in an attractive booth, Miss Clarkson gave her exhibitions clad in a union suit and a close fitting knit petticoat. Miss Clarkson, it may be observed incidentally, is a young woman of piquant face with a figure of faultless outlines and soft undulant curves."

Exhibit "B" is a circular letter written on paper bearing the letter-head of appellant, and reads as follows:

"Chicago,

Dear Doctor:—

While attending the convention this month, you probably saw the articles which appeared in the Chicago Record-Herald and Inter Ocean, reproductions of which we attach hereto.

We feel that we have been greatly injured by these articles, which are in part, untruthful, and we desire to present our evidence and rest our case with the members of the Association. Mrs. A. M. Beeson, whose name is mentioned, was our lecturer, and did not act as model. The model was, in our opinion, properly clothed, being dressed in a waist and skirt. We believed that in giving an exhibition before the scientific men we could show the exceptional merit of our corset by having a properly clad model put it on and take it off without offending anyone's sense of propriety.

We very much regret that the ladies who were members of the Executive Committee offered objections to the demonstration. We believe that there was nothing about our exhibition to which the most modest woman could justly object.

We send you under separate cover a copy of our booklet entitled "Corsets from a Medical Standpoint" which we trust you will find time to read carefully. Physicians have written in the past many articles condemning corsets. Now that there is one on the market which they can conscientiously recommend to patients, they are saying as much in favor of The Gossard Front Laced Corset as they have against the injurious style of garments which have been offered by manufacturers in the past.

Yours very truly,

The H. W. Gossard Co.

H. W. Gossard,

President."

Sten. 2

The evidence also showed that two physicians residing in Chicago had each received by mail and had read copies of said Exhibits "A" and "B"; that ap-

pellant had caused between two and three thousand copies of said exhibits to be printed and had mailed them to physicians in different parts of the United States, postage prepaid, and addressed according to the registry of such physicians at said Medical Convention, single copies of both exhibits being enclosed together in the same envelope; that appellant was a trained nurse and masseuse and had worked at her calling with physicians at hospitals; that she attended the said medical convention and there demonstrated defendant's corsets by means of a properly clothed woman acting as model, but had never acted as model herself; that no complaint had been made of the manner of such demonstration or of her own conduct at the convention; and that so much of the contents of exhibit "A" as referred to her was false. Appellant did not deny the publication of the exhibit aforesaid, but introduced evidence to prove that its only purpose in publishing the same was to deny the truth of the newspaper articles and to correct the false impressions created thereby. It also introduced evidence to the effect that appellee had consented that such publication might be made, and appellee denied that such consent had been given.

Edmund S. Carr, for appellant.

Hiner, Bunch & Latimer, for appellee.

Mr. Justice Duncan delivered the opinion of the court.

The court did not commit error, as contended by appellant, in refusing appellant's request at the close of the evidence to direct a verdict of not guilty. In an action for a libel, it is always a question of law for the court, in the first instance, whether or not the proved publication of the defendant is libelous. If

such publication of the defendant is not susceptible of a libelous meaning, there is no question for the consideration of the jury and a verdict of not guilty should be directed by the court. Where the whole publication is susceptible of only one meaning and is libelous *per se,* it is the duty of the court to instruct the jury that the publication is actionable, if made, and no evidence of a different intent is admissible in such case to prove the defendant's innocence. From the publishing or speaking of actionable words malice is implied, which will justify the assessment of exemplary damages. Gerald v. Inter Ocean Pub. Co., 90 Ill. App. 205; Schmisseur v. Kreilich, 92 Ill. 347; Miller v. Johnson, 79 Ill. 58; Berger v. Pub. Co., 132 Iowa, 290; Dowie v. Priddle, 216 Ill. 553, 558.

It is also the province of the court to determine whether the language of the alleged libel is ambiguous, or double in meaning, one of which is libelous. In determining whether the alleged libel is double in meaning, one of which is libelous, the court must not separate it into parts, and construe each part separately, but must construe each part of the alleged libel in connection with all the rest of it. When the court has so determined that it will bear such double meaning, it is then the province of the jury to determine in which sense the language was used, and for such determination the whole publication should go to the jury. Van Vactor v. Walkup, 46 Cal. 124; Berger v. Pub. Co., 132 Iowa, 290; Graves v. Waller, 19 Conn. 89; Hunt v. Algar, 6 Carr. & Payne, 245, (25 Eng. Com. Law, 415); Young v. Gilbert, 93 Ill. 595.

When the meaning of slanderous words spoken is made doubtful by reason of other words used at the same time or in the same conversation, everything said in connection with the slanderous words must be considered in determining if the words were slan-

derous. Want of malice is a defense. McKee v. Ingalls, 4 Scam. 30; Nelson v. Borchenius, 52 Ill. 236; Zuckerman v. Sonnenschein, 62 Ill. 115; Waller v. Butler, 15 Bradwell, 209; Sollitt v. Moore, 107 Ill. App. 479.

A libel, as defined by our statute, is a malicious defamation, expressed either by printing, or by signs or pictures, or the like, tending to blacken the memory of one who is dead, or to impeach the honesty, integrity, virtue or reputation, or publish the natural defects of one who is alive, and thereby to expose him to public hatred, contempt, ridicule or financial injury. By applying the foregoing rules to the facts in this case it is clear, we think, that the alleged libelous matter, as proved in this case, is susceptible of a double meaning, one of which is libelous, and that it was the province of the jury to determine from the evidence whether or not the appellant was guilty of libeling appellee. If the jury should find from the evidence that the intent and purpose of appellant as to the appellee, in republishing the slanderous article of the Record-Herald was in good faith to vindicate her and to thereby repel the slanderous charge against her character, and that the readers of the whole publication must have so understood it, then the defendant should be found not guilty. If, on the other hand, the jury should find that the mailing of the alleged libelous matter was for the purpose of advertising its corsets, and that the denial of the libelous charges of the Record-Herald was merely a pretense for the purpose of using it and the Inter Ocean article and picture of the model woman in the advertising of its corsets. without regard to appellee's rights in the matter, and appellee was thereby libeled, then appellant in such case should be found guilty. In making this finding it is proper and necessary for the jury to consider both exhibits ''A'' and ''B,'' and even the book-

let referred to, if in evidence, together with all the other evidence in the case. We do not deem it proper to discuss the probative force of each part of these exhibits in reaching our conclusion that the meaning of the publication is double, one of which is libelous, in view of our decision to reverse the judgment, and particularly as we think it apparent from an inspection of the exhibits and the evidence that such discussion is unnecessary.

For the foregoing reasons appellee's instruction No. 1, as read to the jury, is erroneous. It reads as follows:

"You are instructed that any publication, the necessary tendency of which is to expose a person to hatred, contempt or ridicule is a libel, and if you find from the evidence that the defendant caused the article set forth in the declaration to be printed, and mailed it to a number of persons and that it was received and read by one of such persons, and if you also believe from the evidence that plaintiff did not consent that such article should be so printed and mailed, and if you find from the evidence that said article as mailed to such persons by defendant had a necessary tendency to expose the plaintiff to hatred, contempt or ridicule, you will find the issues for the plaintiff."

The vice of this instruction will be readily seen by mere inspection of the instruction. Only the article as published by the Record-Herald is "set forth in the declaration," and the jury are told, in substance, by this instruction that if they found from the evidence "that said article" (set forth in the declaration) "as mailed to such persons by defendant had a necessary tendency to expose the plaintiff to hatred," etc., "you will find the issues for the plaintiff." The article published in the Record-Herald, when considered alone, is libelous *per se*. The instruction violated the rule that the whole publication must be considered in determining the question of whether or not there is a libel. This instruction is necessarily

misleading and there was no other instruction given in the case that had any tendency to correct this error, that is to say, that called the attention of the jury to the fact that the whole publication must be considered in determining the meaning of appellant.

Appellee's second instruction is erroneous. It tells the jury that "if you find the issues for the plaintiff and believe from the evidence that the publication was made maliciously or wantonly and under circumstances evincing disregard for the rights of the plaintiff, and with malice, then in assessing her damages you are not confined to such damages as will simply compensate plaintiff for such injuries as the evidence shows she has received by reason of the publication of the defamatory words set forth in the declaration, but you may in addition thereto assess against the defendant by way of punishment to it and as an example to others such damages as the jury in their sound judgment under all the evidence in the case, believe the defendant ought to pay." This instruction is subject to two objections. In the first place, by the language of the instruction, it is absolutely assumed that the evidence shows that appellee has been injured by reason of the publication of "the defamatory words set forth in the declaration." The instruction is also vicious in telling the jury they may assess against the defendant such damages as the jury "believe the defendant ought to pay," under all the evidence in the case, instead of closing with the proper conclusion, "such damages, if any, as you shall find from all the evidence in the case that she is entitled to recover against the defendant." It should always be borne in mind when formulating instructions to the jury that a plaintiff can only recover "such actual damages as he has *sustained*," and, if it is a proper case for exemplary damages, that he can then only recover such damages as he is *entitled to* under the evidence, and that it must not be assumed by an instruction that he

has sustained damages when the question is contro-
verted. "The jury are to inquire not what the de-
fendant can pay (or ought to pay) but what the plain-
tiff ought to receive." Holmes v. Holmes, 64 Ill. 294;
Smith v. Wunderlich, 70 Ill. 426; Dady v. Condit, 188
Ill. 234.

There was no evidence in this case of the pecuniary
ability of the defendant, and the question of such abil-
ity is virtually submitted to the jury by the above in-
struction, and the damages made to depend solely on
that question. Where such evidence of pecuniary
worth is not proved the jury have no right to give any
more damages than they would if it had affirmatively
appeared that the defendant was without pecuniary
resources. T. W. & W. Ry. Co. v. Smith, 57 Ill. 517;
Mullin v. Spangenberg, 112 Ill. 140, 146.

Appellant's contention, however, that appellee's sec-
ond instruction attempts to submit the question of
actual or express malice as the basis of exemplary
damages, is not tenable, if it means thereby an actual
intent on the part of appellant to do appellee an in-
jury. Express malice, or malice in fact, is not neces-
sary to authorize exemplary damages. Proof of ex-
press malice may be made in any libel case to enhance
the plaintiff's damages, and the defendant may offer
proof showing the absence of express malice in mitiga-
tion of damages, but not as barring the right of the
plaintiff to recover exemplary damages. Hintz v.
Graupner, 138 Ill. 158. Express malice, or malice in
fact, is so commonly understood that a definition there-
of would not seem to be necessary in an instruction to
the jury. The failure of the court to define malice,
and especially malice in fact, could not have injured
appellant in our judgment. Implied malice, or malice
in law, was not in express terms referred to in the in-
structions.

If the intent of the defendant in a suit for a libel or for slander be doubtful, the witnesses may be asked their opinion as to the intent of the defendant. Their answers are not conclusive upon the jury, but such testimony is admissible as tending to show what meaning hearers of common understanding would and did ascribe to the alleged libelous matter. Particularly is this rule applicable where the witnesses are also parties who read the alleged libelous matter. We think the court was in error in excluding testimony of the above character in this case. McKee v. Ingalls, 4 Scammon, 30; Nelson v. Borchenius, 52 Ill. 236; Dexter v. Harrison, 146 Ill. 169; Dexter v. Taber, 12 Johns. (N. Y.) 238; 2 Greenleaf on Evidence, Sec. 417.

It is also argued by appellant that the damages awarded by the jury are excessive. We do not think it necessary or proper to discuss this question, or the merits of the case. For the errors indicated the judgment of the court is reversed and the cause remanded.

*Reversed and remanded.*