## William C. White, Appellant, v. Leopold F. Bourquin, Appellee.

### Gen. No. 6,376.

1. LIBEL AND SLANDER, § 3*—*when words are libelous per se.* Words written or printed are libelous *per se*, that is, without any allegation or proof of special damage, if they expose the plaintiff to public hatred, contempt, ridicule, aversion or disgrace, and to induce an evil opinion of him in the minds of right thinking persons and to deprive him of their friendly intercourse and society, even though the same words if spoken would not have been actionable.

2. LIBEL AND SLANDER, § 159*—*what are questions for court and for jury where language is unambiguous.* Where the words published are clearly defamatory on their face and are unambiguous and incapable of an innocent meaning, the court may, as matter of law, declare to the jury that such words are libelous, leaving it to the jury to say whether the publication was made, with what intent it was made, and whether the published words were true or false.

3. LIBEL AND SLANDER, § 159*—*what are questions for court and for jury where language is ambiguous.* It is the province of the

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

court to determine whether the language of the alleged libel is ambiguous or double in meaning, one of which is libelous, and when the court has so determined that it will bear such double meaning, it is then the province of the jury to determine in what sense the language was used.

4. LIBEL AND SLANDER, § 21*—*when malice and damage presumed.* If words are libelous *per se* it is not necessary to allege or prove special damage; both malice and damage are presumed, and if the general issue only is pleaded the verdict must necessarily be for the plaintiff.

5. LIBEL AND SLANDER, § 3*—*when words in newspaper article are libelous per se.* Language in an action for libel based upon certain newspaper publications, charging that an alderman who was prominent in local option matters was incapable and that he had been addicted to drink in his past life, *held* to be libelous *per se.*

6. LIBEL AND SLANDER § 119*—*what evidence may be given under general issue in mitigation of damages.* In an action for libel, the defendant may give under the general issue evidence of prior publications by the plaintiff of a provoking nature in mitigation of damages.

7. LIBEL AND SLANDER, § 134*—*when letter referred to in libelous matter may be read in evidence.* A previous letter referred to in libelous matter may be read in evidence in explanation of language used in such matter, in an action for such libel.

8. LIBEL AND SLANDER, § 140*—*when circumstances tending to disprove malice may be shown.* Circumstances tending to disprove malice may be shown in an action for libel, but it must appear there was provocation operating as the immediate cause.

9. PLEADING, § 99*—*what is nature of notice of defense.* A notice of defense filed under section 46 of the Practice Act (J. & A. ¶ 8583) calls for no answer by the plaintiff, and no issue of law or fact can be made on it, and no question arises until the defendant offers evidence to support it on the trial, when, if it be found defective or not to state a good defense, evidence will not be admitted under it.

10. PLEADING, § 359*—*what is proper method of testing sufficiency of notice of defense.* A motion to strike from the files, and not a demurrer, is the proper way to test the sufficiency of a notice of defense filed under section 46 of the Practice Act (J. & A. ¶ 8583).

11. SET-OFF AND RECOUPMENT, § 17*—*when there may be no recoupment in action of libel.* There can be no recoupment in an action for libel by showing another libel which provoked that sued on.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

White v. Bourquin, 204 Ill. App. 83.

12. LIBEL AND SLANDER, § 148*—*when jury in action for libel may award more than nominal damages.* In an action for libel for words actionable *per se,* it would be within the right and power of the jury to award more than nominal damages.

13. LIBEL AND SLANDER, § 8*—*how libelous language should be considered.* Alleged libelous language must be considered with reference to the time and place in which it was used.

14. LIBEL AND SLANDER, § 56*—*when newspaper articles are not privileged as public matter.* Newspaper publications charging that an alderman who was prominent in local option matters was incapable and that he had been addicted to drink in his past life, which were libelous *per se, held* not privileged as public matter.

Appeal from the Circuit Court of Jo Daviess county; the Hon. RICHARD S. FARRAND, Judge, presiding. Heard in this court at the October term, 1916. Reversed and remanded. Opinion filed February 10, 1917.

F. J. CAMPBELL and M. H. CLEARY, for appellant.

SHEEAN & SHEEAN and HODSON & HODSON, for appellee.

MR. JUSTICE CARNES delivered the opinion of the court.

This is an appeal from a judgment for the defendant in an action for libel.

Appellant, William C. White, and appellee, Leopold F. Bourquin, in 1915, resided in Apple River, a village of six or seven hundred inhabitants on the northern border of Jo Daviess county. Appellant was a member of the village board of trustees. There was much agitation of questions arising under the local option laws of this State. Appellant was prominent on the "dry" side of the. controversy, and had introduced a village ordinance on that subject, and was said to be instrumental in the summoning of witnesses before the grand jury in prosecution of alleged offenders under the Dramshop Act. Appellee advocated the

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

other side of the question. Appellant was a correspondent of the Shullsburg Pick and Gad, a newspaper published near by in Wisconsin. Appellee was a correspondent of the Hazel Green Reporter, another nearby newspaper published in Wisconsin. They each in their newspaper articles discussed the public affairs of their village. June 17, 1915, appellant published in the Shullsburg Pick and Gad an article as follows:

"Sometime ago an article appeared in the Hazel Green Reporter under the heading 'Can't be good.' The writer stated that he attended the meeting of the Village Board of Apple River 'and after the regular routine of business had been finished, he states that Alderman White said that an ordinance ought to be passed, so the president ordered the clerk to read the dope, which was spread over fourteen sheets of paper. As a matter of fact the ordinance covered just seven pages. The writer of the above mentioned article is given full credit for the seven pages which never existed. He also states that its contents would put a tyrant of ancient times to shame, yet he does not say one word about the nature of its contents. No reader could form the slightest opinion of the nature of the ordinance from what was said. The fact of the matter is, it was 'An ordinance concerning liquor.' Alderman White made the statement before the Board that there was no ordinance in the village ordinance book which conformed to the local option statutes, and thought it was for the best interests of the village to adopt one that would be in legal keeping with the State law. The ordinance was practically a copy of the statute, and what other sections were in it were legalized by the State law. Alderman White also offered annotations containing a great many Supreme Court decisions sustaining every section of the ordinance.

"Furthermore, the same ordinance has been adopted in Jacksonville, Galesburg, Rockford, and over three hundred cities and villages in Illinois. Does this wonderful literary expert mean to call in question the honesty and intelligence of the City Council of Rockford and all of the above mentioned places? Is it possible that his judgment is superior to that of all these people, or is it merely in his own estimation? That is for the reader to judge. It is evident that the city councils which have adopted this ordinance are in favor of law enforcement. If they were not, it would not have been passed.

"The main object in passing the ordinance would be as follows: In the absence of the ordinance, all suits brought for the violation of the local option law would have to be brought in the name of the People of the State of Illinois, instead of in the name of the Village of Apple River. Under the proposed ordinance, fines from convictions would go to the village instead of to the county. This is the sum and substance of the so-called 'fourteen pages of dope.'

"Of course, this ordinance was not intended to shield, vindicate, uphold and protect bootleggers, blind piggers and law violators, but just to the contrary. Is it any wonder that some people of the above type call it a 'damnable piece of nonsense?' No doubt if an ordinance had been introduced compelling every male person in the village to take three or four drinks of whisky and as many bottles of beer every day, or to prohibit the building of any church or other building for the promotion of the public welfare within three miles of any saloon without the unanimous consent of all the saloon keepers within the said distance, or to prohibit any coroner, sheriff, constable, policeman or other officer from entering any complaint, making any arrest, or serving any process on any blind piggers, bootleggers, or illegal vendors of nose

paint, we have reason to believe that such ordinance would meet with approval, and its adoption would have been earnestly and sincerely recommended. The statement that the ordinance was unanimously defeated was not true, as the Journal will show that the votes stood three and three, the president declaring the motion lost.

"There is one thing that Alderman White can say without fear of successful contradiction, that he never sat behind the barred doors of a gambling joint at midnight, shivering and shaking in his shoes for fear that a vigilance committee of law abiding women might break in and catch him red handed. Neither does Alderman White frequently take a Sunday afternoon to Galena or Dubuque to spend his time gambling with cards or other devices, which is contrary to our State laws, or inveigle any of his friends into any game by which they are parted from their hard earned cash. Certain correspondents from here for the last year or more have been heaping tirades of abuse upon people who do not think as they do, or do as they want them to do, but as the old saying has it, 'People who live in glass houses should never throw stones.'
                                        W. C. WHITE.''

This was followed by two articles published by appellee in the Hazel Green Reporter at the dates indicated, reading as follows: (June 24, 1915) ''The correspondent of this department was very much amused last week on reading an article published in a Shullsburg paper, signed W. C. White. It was an attempt to ridicule a certain criticism which had appeared in this department about a month ago on the famous ordinance which was presented to the village board for adoption. Up to this time we have always refrained from entering into the private life discussions of any individuals, and it really surprised us to read his tirade which was intended to attack

our personalties.   The fact of the matter is that if
he knew the pleasure and fun we had out of it he
would be very sorry that he gave us such an oppor-
tunity to laugh and recall many incidents of his past
life.   There are but very few of his old associates but
what have already lost respect for him as a man,
consequently their recollections were freely discussed,
and the sum and substance of it was that such a type
was a success as a society humbug, unfit to be trusted
in any public position.   He is wrapped up in a cloak
of hypocrisy which had to be spread over his follow-
ers to cover up their past.   It will no doubt please him
to have us cite a few quotations from the remarks
passed by different ones who were not actuated by
any personal enmity but have remained men among
men.   They spoke freely as they knew him before the
badge of manhood had been stripped from him.

"The pet names which he refers to as bootleggers,
blind piggers and vendors of nose paint are expres-
sions copied from Billy Sunday's beautiful language,
and who gets a big price for such, and would not refer
to them free of charge against his own past life.
Naturally the boys said after this polite language was
read: 'Why, I remember not long ago when he used
to be the best posted as to where a man could get the
biggest can of beer for five or ten cents to take home.'
While on the farm the boys remember when he bought
it by the keg and took up a collection among them so
he would get his share free.   His hobby was 'can rush-
ing' as he could get more for his money, and usually
that class of people find their associates in back yards,
lumber yards, or at Hinky Dink's in Chicago.   The
only reason he hasn't more of the 'nose paint' on
his nose is that Rye and Bourbon were not on the
bill of fare at the free lunch counters.   So far as
our Galena and Dubuque trips are concerned, they
are in the nature of recreation, which is far more

honorable than to be a 'rubber neck' at every train to get your nose in everybody's affairs. The only time he would take a trip to Galena was for the purpose of getting people into trouble—to either separate families or make the boys pay fines.

"He has been a disturbing element since he located here and certainly would be in obscurity now if woman's suffrage had not been granted, but we are glad to say that a great many of them have discovered his unfitness as a leader to better conditions and the election of last spring was a good showing as to his standing in public opinion.

"We trust he will prove game and not show the white feather, as we are all supplied with ammunition of a more serious nature. We consider this a friendly bout and trust you will be as good as you can under the circumstances. Try our remedy; it works fine.

"Hoping to hear from you again soon, I remain respectfully yours,

CORRESPONDENT HAZEL GREEN REPORTER.

"P. S. We wish to have it understood that our previous criticism and remarks which have appeared in our columns from time to time was only a faint echo compared to what was circulated by these people. We have no society to organize a campaign of damnable lies, consequently we adopted this plan to enlighten the people on public questions, and, as truth will prevail, we kept their associates at a respectable distance at the polls."

(November 11, 1915)

"The correspondent has not devoted much time of late to personals, but in some future issue will take up the trail of the skunks who disturbed the peace of our village last week. We will show you how a few insignificant and harmless looking animals can spray their vile odor and raise more stink than any we have had here for years. What we will have to say about

it is a testimony of disgust from that better class of people—those that have been decent all their lives and were not swept out when decency and good moral characters had a house cleaning. Those who are raising the most 'hell' are ones who were put in the scavenger wagon years ago. Their names have not appeared on the surface, but the people that have made these complaints have squawked and said they were forced to do it by a class that we are positive were no angels a few years ago." The newspapers containing these publications circulated in Apple River and vicinity.

Appellant brought this action of libel, and in his declaration in different counts set out each of the two above-quoted articles written by appellee with innuendoes charging the meaning of various words and clauses found therein, and a colloquium alleging the surrounding circumstances. There was no allegation of special damages.

After the court had overruled demurrers to each count of the declaration and amended declaration upon which the suit was tried, the defendant pleaded not guilty, and took leave "to give notice of any special matter." Pursuant to that leave he filed a notice that he would give in evidence and insist that before and at the time of the commencement of this suit the defendant was, and still is, "indebted to the plaintiff in the sum of $5,000, the amount for which plaintiff has brought suit." The notice goes on to state that the plaintiff had on June 17, 1915, published in the Shullsburg Pick and Gad a libel on the defendant and sets out the article so alleged to be published. (The article written by appellant above quoted.) That the defendant has been damaged by that defamatory matter and that on the trial the defendant will allow the plaintiff, if any damages are proven by him on his part, as much as may be found to be due the plaintiff

out of said sum of money due the defendant from the plaintiff herein. The court overruled a general demurrer to this notice of defense. The notice did not purport to be a plea, and did not conclude to the country, or with a verification, but the plaintiff filed a *similiter* "to the pleas of the defendant by him in the above case pleaded and whereof he has put himself upon the country does the like."

On a jury trial the publication of the articles by appellee was proven; also against the objection of the plaintiff his publication of the article above set out. In the instructions the court, at the instance of the plaintiff, submitted the question to the jury whether the articles published by the defendant were capable of a meaning so as to bring the plaintiff into public hatred, contempt or ridicule, and whether they were so understood by those who read them, and also that they might consider the article published by the plaintiff for no other purpose than to determine the meaning of the article published by the defendant June 24, 1915, and as showing the feeling of malice or otherwise of the defendant in writing said article. And at the instance of the defendant that if the plaintiff had not proven by a preponderance of the evidence that the defendant maliciously and falsely wrote and caused to be published the words, or some of them, charged in the declaration, the verdict should be not guilty. There was a verdict of not guilty, and judgment entered thereon, from which this appeal is taken.

Appellant argues that there being no conflict in the testimony as to the publication of the articles by the defendant he was entitled to a verdict, and the court erred in submitting the question to the jury whether there should be a verdict for the plaintiff or defendant. His sixth and seventh refused instructions were intended to advise the jury that there must be a verdict for the plaintiff, but they were offered with other

instructions that left that question to the jury, leaving
the court to choose between the two theories of the
case and appellant in no position to complain if he
chose the wrong one. Appellee answers that the arti-
cles are neither of them actionable *per se;* therefore
the above questions were necessarily left to the jury,
and says the innuendoes in the declaration cannot be
considered in determining whether or not the publica-
tions were actionable *per se.* Libel is defined in our
criminal code (J. & A. ¶ 3808) as "A malicious
defamation, expressed either by printing, or by signs
or pictures, or the like, tending to blacken the memory
of one who is dead, or to impeach the honesty, integrity,
virtue, or reputation or publish the natural defects
of one who is alive, and thereby to expose him to pub-
lic hatred, contempt, ridicule, or financial injury." A
similar definition is given in the text of 25 Cyc. 243,
as one that has frequently met with judicial approval
in civil and criminal cases: "The law recognized two
classes of damages in suits for defamation—general
and special. Special damages are such as are com-
putable in money. General damages are those which
the law presumes must actually, proximately and
necessarily result from the publication of the defama-
tory matter. The latter arise by inference of law
and are not required to be proved by evidence, and
are allowable whenever the immediate tendency of the
words is to impair plaintiff's reputation, although no
actual pecuniary loss has in fact resulted; the words
from which the law presumes injury in such cases
being deemed actionable *per se.* All other defamation
is actionable *per quod;* that is, special damages must
be alleged and proven." 25 Cyc. 249.

Many charges which if merely spoken of another
would not be actionable without proof of special dam-
ages will be libelous *per se* when written or printed
and published. Id. 250. Words written or printed are

libelous and actionable *per se;* that is, without any allegation or proof of special damages "if they tend to expose plaintiff to public hatred, contempt, ridicule, aversion or disgrace, and to induce an evil opinion of him in the minds of right thinking persons and to deprive him of their friendly intercourse and society, even though the same words, if spoken, would not have been actionable." Id.; *Cerveny v. Chicago Daily News Co.,* 139 Ill. 345; *Herrick v. Tribune Co.,* 108 Ill. App. 244.

The rule is "that if the words published are clearly defamatory on their face and are unambiguous and incapable of an innocent meaning, the court may, as a matter of law, declare to the jury that they are libelous, leaving it to the jury to say whether the publication was made, with what intent it was made, and whether the published words were true or false." *Dowie v. Priddle,* 216 Ill. 553, 558. It is the province of the court to determine whether the language of the alleged libel is ambiguous or double in meaning, one of which is libelous. "When the court has so determined that it will bear such double meaning, it is then the province of the jury to determine in which sense the language was used." *Beeson v. H. W. Gossard Co.,* 167 Ill. App. 561, 569, and authorities there cited. If the words are libelous *per se,* it is not necessary to allege or prove special damages, both malice and damages are presumed, and if the general issue only is pleaded the verdict must necessarily be for the plaintiff. *Willfred Coal Co. v. Sapp,* 193 Ill. App. 400.

We are of the opinion that the language charged in the declaration is libelous *per se.* We do not see how there can be any question about its having an ambiguous or double meaning. The court properly overruled demurrers to each count of the declaration, which action was not necessarily based on an opinion that the language was libelous *per se* and incapable

of an innocent meaning, but might have been well based on that ground. It therefore follows under the above authorities that the verdict should have been for the plaintiff, and if it be said that appellant cannot complain of the action of the court in submitting that question to the jury it still remains true that the verdict of the jury was so manifestly against the evidence that a new trial should have been granted for that reason.

Appellant assigns and argues error in permitting his letter to be read in defense. We think it was competent under the general issue not only as explanatory of appellee's first letter, but also for other reasons.

"In the absence of statute, any defense which does not amount to a justification may be given in evidence under the general issue in mitigation of damages." 25 Cyc. 476. The defendant may prove prior publications by the plaintiff of a provoking nature in mitigation. *Thomas v. Dunaway*, 30 Ill. 373. The court said on page 387 such publications may show "that they were highly calculated to provoke appellant, and that his act was not of such a wanton, reckless and malicious character as to require severe punishment." A previous letter referred to in the libelous matter complained of may be read in evidence in explanation of language used in the alleged libel. *Young v. Gilbert*, 93 Ill. 595. In criminal cases the fact that the publication was made under provocation by the prosecuting witness is said to be competent to be considered in mitigation of punishment. 25 Cyc. 585. Circumstances which tend to disprove malice may be shown. *Storey v. Early*, 86 Ill. 461. But it must appear there was provocation operating as the immediate cause. 25 Cyc. 421. The parties treated the notice of defense under the general issue as a plea, and the court overruled a demurrer to it. We assume

the defendant in filing that notice relied on section 46 of our Practice Act (J. & A. ¶ 8583). We know of no authority for such notice except the statute. The notice calls for no answer from the plaintiff, and no issue of law or fact can be made upon it, and no question arises until the defendant offers evidence to support it on the trial. If the notice is then found defective or does not state a good defense, the court will not admit evidence under it. *Burgwin v. Babcock,* 11 Ill. 28; *Bailey v. Valley Nat. Bank,* 127 Ill. 332. If there is any exception or qualification of the language above used it is that the sufficiency of a notice may be tested by motion to strike from the files. 31 Cyc. 191. The court did not err in overruling the demurrer to the notice, because that was not the way to test its sufficiency. Notwithstanding the language of the notice it is not claimed by appellee that there can be a set-off in this action. He speaks of this defense as a recoupment. There is no indication in any law that we have been referred to, or know of, that there can be a recoupment in cases like this. Publications are not treated as growing out of the same transaction within the meaning of that term as applied to the right to recoup in the authorities that we have examined where one slander or libel has been provoked by another.

Appellant admits that if the words are held actionable *per se,* where the general issue only is pleaded, the law implies both malice and damages, but also says that a new trial should not be granted to permit a recovery of nominal or vindictive damages, and cites authorities in support of that general rule. It would be within the right and power of a jury to award more than nominal damages on another trial, and we think we ought not to assume on this record that they would or would not do so. Appellee also argues that this was a public matter and he was privi-

leged to discuss it as such. It is true that such a privilege sometimes exists, and also that alleged libelous language must be considered with a reference to the time and place in which it is used; but we see no ground for holding that the publication here complained of should be held privileged. Other questions are raised by appellant in matters that will not likely occur on another trial. The judgment is reversed and the cause remanded.

*Reversed and remanded.*