Ralph Cook, Appellee, v. East Shore Newspapers, Inc. et al., Appellants.

Term No. 44,010.

Heard in this court at the May term, 1945. Opinion filed October 26, 1945. Rehearing denied February 4, 1946. Released for publication February 7, 1946.

CHARLES C. LEFORGEE, of Decatur, and HENRY DRIEMEYER, of East St. Louis, for appellants.

James A. Farmer, of Belleville, Louis Beasley and J. R. McMurdo, both of East St. Louis, for appellee.

Mr. Justice Bartley delivered the opinion of the court.

Plaintiff appellee, Ralph Cook, judge of the city court of East St. Louis, brought suit against the East Shore Newspapers, Inc., a corporation, Edward Lindsay, R. A. Barracks, and P. H. Wire, for libel because of alleged libelous statements published by the East St. Louis Journal in the City of East St. Louis on the 27th day of August 1934. The action was instituted on the 13th day of November 1934, and was originally tried before a jury which resulted in the return of a verdict of guilty by the jury on January 28, 1938, and wherein the jury assessed plaintiff's damages at $37,500. Afterwards, the court allowed a motion for judgment notwithstanding the verdict as to the defendant, R. A. Barracks, and also allowed a motion in arrest of judgment as to the three remaining defendants. Afterwards, R. A. Barracks was dismissed by the plaintiff as party defendant. Various amendments were made to the pleadings, and commencing on May 12, 1942, the case was again tried with the aid of a jury. On May 19, 1942, the jury, being unable to agree upon a verdict, was discharged by the court from further consideration and a mistrial was ordered. On November 1, 1943, by agreement of the parties, the cause was tried before the court without a jury. The evidence was concluded on November 2, 1943, and on April 11, 1944, the court entered its order finding the defendants, the appellants here, East Shore Newspapers, Inc., a corporation, Edward Lindsay, and P. H. Wire, guilty and assessed the plaintiff's damages at $20,000, and entered judgment accordingly and for costs of suit. East Shore Newspapers, Inc. was the publisher of the East St. Louis Journal, Edward Lindsay was its editor, and P. H. Wire was its general manager.

The alleged libelous language consists of the headlines of the publication of the East St. Louis Journal of August 27, 1934, for the article carrying the story relating to and containing the statements which are charged to be libelous, the lead paragraphs of the story, and portions of another article relating thereto. The headlines which, it is alleged, were libelous are:

" 'Shakedown' Charges Against Judge Cook
Made by Widow

Employe Says Payment Made to Keep Job."

These headlines are followed with two subheadlines which are not the basis of any alleged libel, but which are:

"Mrs. Charlotte Kelly, Court Reporter, Tells
Attorney General Her Position Was Bought
and Paid For; That Resignation was
Demanded When Payments Ceased

Investigation Is Opened."

The lead paragraphs which are alleged to have constituted libel and including one paragraph about which there is no charge of libel, are as follows:

"A Judge selling jobs—

A court of justice demanding and receiving part of the salary of its own employes as the price of employment—

A widow compelled to accept the terms of a commercial-minded judge on the bench, in order to hold her place—

This is the situation revealed by The Journal's investigation of East St. Louis city courts.

The charges are supported by affidavit. Attorney General Otto Kerner of Illinois, informed in Springfield about the facts uncovered by The Journal, today

promised investigation with all the resources of the state government.

The judge referred to is Ralph Cook, of the East St. Louis city court. The employe who has been willing to swear that Judge Cook demanded a part of her salary, as the price of employment, is Mrs. Charlotte R. Kelly.''

The fifth paragraph of the lead is the one about which no charge of libel is made and is:

''The charges are supported by affidavit. Attorney General Otto Kerner of Illinois, informed in Springfield about the facts uncovered by The Journal, today promised investigation with all the resources of the state government.''

The portions of the other article alleged to be libelous appear under an article with a headline and subheadline as follows:

''Widow Ready to Lose Job for Sake of Justice

Mrs. Kelly at First Refused to Talk,. But
Confronted With Torn Affidavit Tells
All.''

and the portions of the paragraphs complained about are:

'' 'We have information, Mrs. Kelly, that you have been taxed about $100 a month by Judge Cook to keep your job as court reporter.

We have enough now to start an investigation by the state's attorney. You know that's a criminal offense, bribing a public official to keep your job.' ''

The amended complaint charged the defendants with having published the alleged libelous statements maliciously, in the knowledge that they were false, or that in the exercise of ordinary diligence they could have ascertained that they were false, and that the statements were false, scandalous, malicious and de-

famatory. Plaintiff also alleged that he had been greatly injured in his good name and reputation, and had been brought into public scandal, ridicule and disgrace, had been shunned and avoided by divers persons, and had been otherwise injured, and damages were alleged at $100,000.

The defendants appellants by proper pleadings below and here, allege as grounds for reversal of the judgment of the court, that the alleged libelous charges were true and published with good motives and for justifiable ends; that they were privileged as being a report of proceedings of a complaint filed with and proceedings before the attorney general; and that they were privileged as being fair comment and criticism of a public officer and the right to review and comment upon a charge of inefficient and corrupt administration of government; and that the judgment is in violation of and a denial of the appellant's rights under art. II, sec. 4 of the Constitution of the State of Illinois, and under the First and Fourteenth Amendments to the Constitution of the United States. It is also claimed that the damages are excessive and should be no more than nominal if the judgment is permitted to stand.

Insofar as the defendants appellants are concerned, the events leading up to the alleged libelous publication had their inception in the call of a reporter of the defendant publisher's newspaper in the afternoon of August 24, 1934, at the office of Kevin Kane, a practicing lawyer in East St. Louis, as a matter of routine coverage of politics.

According to this reporter, Mr. Kane at that time directed his attention to parts of papers in his waste basket and gave him some information in relation to a matter between Charlotte R. Kelly and Judge Cook. As shown by the record, the reporter then returned to his office and had a conversation relative thereto with the city editor of the newspaper, and returned to

Mr. Kane's office between 4:15 and 5:00 o'clock. When he arrived at Mr. Kane's office, Mr. Kane had gone, and the janitress was opening the office and he got the pieces of paper in the waste basket, tipped the janitress $4, and took the pieces back to his office and pieced them together. The money to tip the janitress and gain entrance to Mr. Kane's office had been obtained by the reporter from the business office of the newspaper. When the reporter returned to the newspaper office, he telephoned the city editor, and as a result, he and another employee of the paper, pasted the pieces together on a cardboard. The pieces of paper as put together resulted in what was an unsigned statement of Charlotte R. Kelly, and is as follows:

"East St. Louis, Ill.
August 24th, 1934

I, Charlotte R. Kelly, under solemn oath, do hereby swear that the following facts are correct:

I campaigned for Judge Ralph Cook when he was elected as City Judge in February, 1933 for which I received no recompense, having asked for none. Upon applying for the position of Court Reporter, I was told that in order to obtain same I would have to sacrifice one third of my salary which, at that time was Thirty-Six Hundred Dollars per year. Having been without employment for some time, I was desperate for a position and accepted the terms. He stated he was in debt for his campaign. Since that time, I have paid him approximately One Thousand ($1,000.00) Dollars and for the past three months May, June and July, have not given him any money. I told him I was unable, because of many debts, to give him any more salary; that I understood his campaign was paid for and wanted some money for myself. He told me in that event he would have to get some one else. I replied: 'Well, if you do, they will not pay you Ninety Dollars.' At the time I received my checks since May,

his attitude has been surly and unbearable. On August 13th, 1934, he told me he was compelled to look for some one else, I replied. 'Oh, I expected as much, it's finances that's bothering you, isn't it?' He replied: 'Well, partly, but you've been talking too much.' I asked him what I had said and whom to and he replied in some manner that I could not make sense of. He seemed not to be able to get his thoughts together and jumped from one matter to another without finishing it.

Since my appointment on February 13th, 1933 up to July, 1933 I received Thirteen Hundred fifty and no/100 Dollars of which I was obliged to sacrifice Four Hundred Eighty-two and 40/100 Dollars because of the Deficiency Bill at Springfield, this at the request of Governor Henry Horner. After July, 1933 my monthly income was Two Hundred Seventy Dollars of which I was expected to contribute Ninety-Dollars to Judge Ralph Cook, which I have done up to May, 1934, making in all the sum of One Thousand Dollars contributed.

East St. Louis, Ill.

Aug. 24, 1934

Subscribed and sworn to before me this 24th day of August, A. D., 1934.''

In pursuance to instructions received from the city editor of the defendant publisher's newspaper, he and another reporter called on Charlotte R. Kelly at her home, the day following the obtaining of the pieces of paper by the reporter. He interviewed her concerning the charges she had made against Judge Cook, in writing, in the paper which was pieced together by the reporter. Mrs. Kelly refused to talk about the matter, and after some thirty minutes in an endeavor on the part of the newspaper to get her to talk, she stated that the only person she would talk to was the attorney general. She then, as put by the witness re-

porter, consented to prosecute. This was only after the reporter had told her that they had enough to start an investigation by the state's attorney, and that it was a criminal offense on her part "bribing a public official to keep your job."

During a conversation between Mrs. Kelly and Mr. Kane at his office, it was she who tore the statement into bits and deposited them in the waste basket. Mr. Kane had been candidate for city judge against Judge Cook and his testimony as to just what occurred between him and Mrs. Kelly is very hazy because, as he says, it occurred so long previous to the time of his testimony. It does appear, however, that Mrs. Kelly went to Mr. Kane for the purpose of registering the complaint against Judge Cook and received no encouragement, and from there on in, the record shows that the matter of the investigation of the alleged charges, and what was done relative thereto, was on the initiative and at the direction of the defendant publisher's newspaper and its officers and employees.

After Mrs. Kelly had said that she would talk to the attorney general, one of the reporters called the newspaper's office. As a result, the two reporters and Mrs. Kelly returned to a point near the office. One of the reporters went to the office, leaving Mrs. Kelly and the other reporter in the car. Some one from the office of the newspaper called the attorney general's office at Springfield. Following instructions of the reporters' supervisors, one reporter drove with Mrs. Kelly to the office of the attorney general in Springfield. There they met an assistant attorney general, a Mr. Neiger, and a Decatur photographer for the Decatur Herald and Review, one of the newspapers of which the defendant Lindsay is editor. They went immediately to Mr. Neiger's office, and the reporter told him that he had brought Mrs. Kelly. She gave the story which is the subject matter of her statement to the assistant attorney general, and the reporter

presented to him a copy of the pieces of the paper which he had pieced together. During the conversation which occurred there, Mr. Neiger called Otto H. Kerner, the then attorney general, in Chicago and following this telephone conversation, Mr. Neiger, the assistant attorney general, instructed Mrs. Kelly to prepare an affidavit and return to his office after it was prepared. While at the office of the assistant attorney general, the newspaper reporter called the defendant Lindsay at the office of the Decatur Herald and Review in Decatur and transmitted the suggestions that the assistant attorney general had made. The reporter then took Mrs. Kelly to Decatur and went to Mr. Lindsay's office and there Mrs. Kelly dictated to an employee of the Herald and Review the affidavit which she there signed and swore to, and which was later published on August 27, 1934, in the East St. Louis Journal on its front page and under the first two headlines of the paper, hereinbefore set forth, under the title "Mrs. Kelly's Affidavit." This affidavit is as follows:

"Illinois, August 25, 1934

I, Charlotte R. Kelly, under solemn oath, do hereby swear that the following facts are correct:

I campaigned for Judge Ralph Cook when he was elected city judge in February, 1933, for which I received no recompense, and asked for none.

Upon applying for the position of court reporter I was told that in order to obtain the same I would have to sacrifice one-third (⅓) of the salary involved, the position at that time paying thirty six hundred dollars ($3,600.00) per year. Being a widow with dependents and having been without employment for some time, I was desperate for a position and accepted the terms.

He stated he was in debt for his campaign. Since that time I have paid him approximately one thousand dollars ($1,000.00), and for the past three months, May, June and July, have not given him any money.

I told him I was unable, because of many debts, to give him any more of my salary; that I understood his campaign was paid for, and that I wanted some money for myself. He told me in that event he would have to get some one else. I replied: 'Well, if you do, they will not pay you ninety dollars ($90.00).'

Each time I received my checks since May his attitude has been surly and unbearable. Around August 13, 1934, he told me he had made arrangements to get some one else, and that he wished my resignation. I replied: 'Oh, I expected as much. It's finances that's bothering you, isn't it?' He replied: 'Well, partly, but you have been talking too much.' I asked him what I had said, and whom to, and he replied in some manner that I could not make sense of. He seemed not to be able to get his thoughts together, and jumped from one matter to another without finishing it.

Since my appointment on February 13, 1933, up to July, 1933, I received thirteen hundred fifty dollars ($1,350.00) of which I was obliged to sacrifice three hundred eighty-two and forty hundredths dollars ($382.40). Because of the deficiency bill enacted at Springfield at the request of Governor Henry Horner after July, 1933, my monthly income was two hundred seventy dollars ($270.00), of which I was expected to contribute ninety dollars ($90.00) to Judge Ralph Cook, which I have done up to May, 1934, making in all the sum of one thousand dollars ($1,000.00) exacted.

Charlotte R. Kelly (SEAL)

Illinois, August 25, 1934

State of Illinois⎱ ss.
County of ⎰

Subscribed and sworn to before me, a Notary Public, this 25th day of August 1934 A. D.

Ida W. Zoch

Notary Public''

After the signing of the affidavit, the reporter took Mrs. Kelly to a hotel in Decatur where either she or the reporter registered her under the name of "Kermer." She and the reporter remained at the hotel until Monday morning. While staying in Decatur, Mrs. Kelly's hotel expense was paid by the reporter with money furnished by the East Shore Newspapers, Inc.

While at the office of the Herald and Review on Saturday, after the affidavit was signed and sworn to, a photograph of the same was taken. On Monday morning, August 27, the reporter took Mrs. Kelly back to Mr. Neiger's office in Springfield, where the reporter presented the affidavit to him. This was the first time that Mrs. Kelly had seen it after she had signed and sworn to it on the previous Saturday, in the office of the Herald and Review. The Assistant Attorney General Neiger then called Attorney General Kerner in Chicago and told him of the substance of the affidavit. The reporter and Mrs. Kelly then returned to the office of the Herald and Review in Decatur. According to defendant Lindsay, the story, including the leads, was prepared, at his request, by an editorial and special writer or columnist for all of the papers of the defendant East Shore Newspapers, Inc. from a story written by the reporter who had interviewed Mrs. Kelly and taken her around. He testified further it was written on the Saturday before Monday, August 27, 1934, the date of the publication, and that this was following a telephone conversation he had had with Attorney General Kerner and his assistant, Mr. Neiger, at Springfield on Saturday, August 25.

The story as written by the special writer was transmitted to East St. Louis by teletype and the defendant Wire says that it came to his attention on Monday morning of the 27th between 9:00 and 10:00 o'clock in the morning that the story was going to be published. The story as published with the headlines, hereinbefore set out, of "Shakedown Charges Against

Judge Cook Made by Widow'' and the subheadlines, is the same as the one prepared by the special writer, with the exception that in the fifth paragraph of the lead paragraphs, which are alleged to be libelous, the sentence as published reads: ''The charges are supported by affidavit'' whereas in the story prepared by the special writer, this sentence reads: ''The facts are supported by affidavit.''

Attorney General Kerner testified that at the time he received the telephone call from his assistant, Neiger, on Saturday, August 25, he directed him to secure a sworn affidavit from Mrs. Kelly; that he did not see the affidavit until late in the afternoon of Monday, August 27, after coming down on a train that arrived there about 3:00 or 3:30, and that it was at this time that he told his assistant to investigate the matter and see what ought to be done. The newspaper carrying the alleged libelous statements and the stories in question, appeared on the streets in East St. Louis shortly after 2:00 o'clock, so it appears that the publication was made before Mr. Kerner had ordered an investigation.

Prior to the publication, a reporter of the defendant publisher's newspaper interviewed Judge Cook and showed him a copy of Mrs. Kelly's affidavit which was published. He denied the statements made by Mrs. Kelly and characterized her as being a ''God Damn Liar.''

Mrs. Kelly testified among other things, that she and Judge Cook had an acquaintance since they were each 10 or 12 years of age and that some time prior to his election, she had a conversation with him relative to the position of court reporter; that she offered to work for him and assist in getting him elected, if she could get the position as court reporter; that she interested herself actively in his campaign and that after his election, he agreed he would appoint her if she would give him one third of her salary, to which ar-

rangement she agreed, and in pursuance to which arrangement, she was appointed court reporter on February 14, 1933, and continued to act as such until the early part of August 1934, when she was discharged for failure to make the payments; she further testified that she received a salary of various amounts which total about $4,500, and that she paid Judge Cook from her salary in all $1,000. She also testified in detail as to the making of her statement heretofore set out; that the affidavit was made in her connection and relation with the East St. Louis Journal and its officers and employees, including the trips to Springfield and Decatur. In general, she testified as to facts showing the charges made in her statement and affidavit to be true.

On cross-examination, it appears that at the time of trial, she was living in St. Louis, Missouri, and that she came over to Illinois to testify at the request of the East St. Louis Journal by their counsel; that she had not received a single penny for testifying, but had received $80 a month for a period commencing in late 1934 and ending in May 1942, and amounting in all, according to her statement and the statement in the record of counsel for the defendants, to $6,474.96. This amount, she says, was paid to her to remain within the jurisdiction of the court.

She testified further on cross-examination, that during the campaign, she worked directly under plaintiff Cook, and reported to him generally at his office in the First National Bank Building in East St. Louis.

She further testified on such cross-examination that prior to the taking of the deposition of September 29, 1937, she left St. Clair county and went to Monroe county to evade service of the subpoena, and she admitted that she had testified when her deposition was taken, that she had learned of the issuance of this subpoena from the defendant Wire.

She further testified on cross-examination, that she signed the affidavit in question on August 25, 1934, in defendant Lindsay's office in Decatur. She admitted on cross-examination that she testified when her deposition was taken, that she had neither written nor dictated the original affidavit which was published in the East St. Louis Journal. On direct examination, she had stated that she dictated the affidavit at the office of Mr. Lindsay in Decatur.

The plaintiff Ralph Cook testified, among other things, that he had known Mrs. Kelly since they were children; that he had lived at 528 Washington Place, East St. Louis, since June of 1913, when his father and mother and family moved to that address; that at that time he was about 27 years of age; that the office from which his campaign was conducted was his own on the third floor of the First National Bank Building in East St. Louis; that at no time prior to or during the primary election or the election did he see Charlotte Kelly, nor had she at any time offered to assist him in getting elected; that he did not have any conversation with her about anything during the campaign and until after he was elected on February 4, 1933; that Clarence Simpson was his campaign manager and that the campaign was conducted from his office on the third floor of the First National Bank Building; that the first time he saw Mrs. Kelly was some time after his election which was on Monday, February 6, and that it was following this call that he appointed her court reporter; that he had at no time demanded from her or received from her any money whatsoever, or any part of her salary; that he discharged her on August 8, 1934, for talking too much; that she had carried tales from one lawyer to another; that complaints had come to him from practicing attorneys; that he had cautioned her for a half a dozen times or more, but that her talking kept getting worse;

that after her discharge on August 8, 1934, she came to his office on the following Monday and offered him something that looked like money; that she asked him if he would take it and reconsider, and he said no; that this was the only instance that he ever saw any money in her hands as an offer or tender of money to him; that it was the only time during his entire acquaintance with Charlotte Kelly that money was talked about or in evidence.

Clarence Simpson testified that he had known Judge Cook for 33 years; that he was his campaign manager when he became a candidate for nomination in 1932; that he had an office in Judge Cook's office and that he was there from 9:00 in the morning until 5:00 o'clock in the afternoon; that he had charge of the work in behalf of Judge Cook's election; that he never heard Charlotte R. Kelly's name mentioned during the primary; that she was not in that office while he was there; that the first time he ever saw her was after Judge Cook's election; that to his knowledge, she did not take any part either in the primary election or in the election for judgeship; that she was not, to his knowledge, ever in his office in those headquarters during that period.

There does not appear in the record anywhere any evidence of an investigation having been conducted by the attorney general or the attorney general's office. The matter was seemingly concluded insofar as the attorney general's office was concerned, by his letter which was offered in evidence, dated September 6, 1934, wherein he acknowledged receipt of a letter dated August 5 from Mrs. Kelly. The letter of the attorney general of September 6 was dictated by J. J. Neiger. Mr. John Neiger at the time of the trial of the case was dead. In this letter addressed to Mrs. Kelly, receipt of a letter of August 5 addressed to Mr. Neiger is acknowledged, and she is told that as stated in her interview had in the attorney general's office with Mr.

Neiger, that the attorney general's office had nothing to do with her private claim against Judge Cook and that her private claim does not come within the purview or the jurisdiction of the attorney general's office in any manner whatsoever. The letter in evidence from Mrs. Kelly to Mr. Neiger, assistant attorney general, bears the date, August 5, 1934. In this letter, Mrs. Kelly purports to give what she terms, some few pertinent facts which might be of value to the investigation then on at East St. Louis. She then gives the names of some individuals who she says know about her paying "tribute" prior to Judge Cook's asking for her resignation. She adds further, that she believes her telephone to be under observation, as she says there is a peculiar noise when all outgoing and incoming calls are made, which she had not noticed before, such as some one getting in on the line; that a point not to be overlooked, is the bringing out of Judge Cook's intense jealousy regarding the education of her daughter and her buying furniture. These letters were each offered in evidence as defendants' exhibits.

While the letter from Mrs. Kelly to Mr. Neiger is dated August 5, there is nothing in the record which indicates that her first contact with Mr. Neiger was before August 25, 1934, when she was taken to him by the reporter of the defendant publisher's newspaper, nor is there anything to indicate that an investigation was sought to be made prior to the events leading up to the publication of the alleged libel. It would seem probable, therefore, that this letter was misdated and was actually dated some time after Mrs. Kelly visited Mr. Neiger, and that the interview Mr. Neiger is referring to in his letter of September 6 is the one of August 25 had with her and the reporter for the defendant publisher's newspaper.

What we have heretofore recited in this opinion is a fairly detailed resume of the record of the case, the facts proven and evidence heard. Other details will

be hereafter referred to in discussing the issues involved.

We now come to a discussion of the issues for decision by this court. We take up first the position of the appellants that the alleged libelous charges were true and published with good motives and for justifiable ends. Under art. II, sec. 4 of the Constitution, in both civil and criminal cases, the truth, when published with good motives and for justifiable ends, is a defense, and under the issues raised by this defense, the alleged libel must be true and must also be published with good motives and for justifiable ends. If the libel is not true, then under this provision of the Constitution, even if published with good motives and for justifiable ends, it is no defense.

The newspaper in its lead paragraphs stated as follows:

"A judge selling jobs—

A court of justice demanding and receiving part of the salary of its own employes as the price of employment—

A widow compelled to accept the terms of a commercial-minded judge on the bench, in order to hold her place—

This is the situation revealed by the Journal's investigation of East St. Louis city courts.

The judge referred to is Ralph Cook, of the East St. Louis city court. The employe who has been willing to swear that Judge Cook demanded a part of her salary, as the price of employment, is Mrs. Charlotte R. Kelly."

These constituted direct libelous charges as facts by the newspaper against the plaintiff.

The trial judge held and decided that these libelous statements had not been proven by the defendants to be true, and that they were not true. This was a question of fact determined by the trial judge, and unless contrary to manifest weight of the evi-

dence, is binding on this court. The trial judge in his memorandum of his decision, commented on the testimony given by the witness, Charlotte R. Kelly, and stated that contradictions, evasions, unresponsive statements appeared in her testimony and that her antagonism to plaintiff was manifest; that her appearance and attitude as a witness, was highly unfavorable and her testimony was unpersuasive; that she was contradicted by herself and witnesses for the plaintiff; that this together with her entire demeanor as a witness, rendered her evidence of little probative value. After a careful examination of the record here, we conclude that the conclusion of fact on this issue by the trial judge was correct, and that the charges contained in these lead paragraphs were not true.

We come now to consideration of the position of the defendants that the alleged libelous charges were privileged. Privileged communications are divided into two general classes: (1) those absolutely privileged, and (2) those only conditionally privileged. An absolutely privileged communication is one in respect of which by reason of the occasion on which or the matter in reference to which it is made no remedy can be had in a civil action. This class is narrow and is practically limited to legislative and judicial proceedings and other acts of State, including communications made in the discharge of a duty under express authority of law, or to heads of the executive departments of the State, and matters involving military affairs. A publication which is conditionally or qualifiedly privileged is one made in good faith on any subject matter in which the person publishing has an interest, or in reference to which he has a duty if made to a person having a corresponding interest or duty, even though it contains matter which without this privilege would be actionable. The essential elements of the conditionally privileged communication are good faith and interest to be upheld, a statement lim-

ited in its scope to this purpose, a proper occasion and published in a proper manner and to proper parties. Such privileged publications lose their character as such on proof of actual malice. (33 Am. Jur. 124, 125, 126, chapter on Libel and Slander, par. 126 and 127; *Krumin v. Bruknes,* 255 Ill. App. 503, 507.)

It is the latter class of conditional privilege that we understand constitutes the grounds of defense here in that respect, and it is claimed that the alleged libelous statements are such by reason of being a report of proceedings before the attorney general, and that as such, they are public, and that they constitute fair criticism and comment upon a public officer.

It is the law in Illinois that publication by a newspaper of a statement of fact, which is not true, against an individual and which is libelous *per se,* is actionable and not privileged. (*Rearick v. Wilcox,* 81 Ill. 77; *People v. Fuller,* 238 Ill. 116; *Ogren v. Rockford Star Printing Co.,* 288 Ill. 405; *Jackson v. Stevens,* 201 Ill. App. 135; *White v. Bourquin,* 204 Ill. App. 83; *Cooper v. Lawrence,* 204 Ill. App. 261; *Cooper v. Illinois Publishing & Printing Co.,* 218 Ill. App. 95; *Hotz v. Alton Telegraph Printing Co.,* 324 Ill. App. 1.) This is in accordance with the great weight of authority. (*Washington Times Co. v. Bonner,* 66 App. D. C. 280, 86 F. (2d) 836, 110 A. L. R. 393, 412.)

The foregoing statement of law is in no way in conflict with the right of a newspaper to report judicial proceedings and other like proceedings, and to fairly comment thereon, or to report matters of public interest and comment thereon, or to fairly comment on and criticize public officers and the like. However, as held in the cases cited, when a newspaper goes further than a report of proceedings and fair comment and criticism, and states as a fact that which is false and libelous *per se,* then the privilege ceases. It is contended here that the publication was a report of

proceedings pending before the attorney general, and is therefore privileged in like manner as a report of judicial proceedings. No authorities have been cited, nor do we know of any that extends this rule to complaints lodged with executive and administrative officers such as States' attorneys and attorney generals, but assuming, without deciding, the rule to be true when a newspaper goes further than the report of proceedings and makes statements of fact by it of things which are libelous *per se*, then the rule ceases to exist. (*Burrows v. Pulitzer Publishing Co.* (Mo. App.), 255 S. W. 925, 929; *Dorr v. United States,* 195 U. S. 138, 49 L. Ed. 128, 134.)

In the case of *Washington Times Co. v. Bonner,* 66 App. D. C. 280, 86 F. (2d) 836, 110 A. L. R. 393, 399, the court said:

"Another qualified privilege recognized by the law is the privilege to publish reports of judicial proceedings even though such proceedings contain false defamatory statements. *Kimball v. Post Publishing Co.,* 199 Mass. 248, 85 N. E. 103, 19 L. R. A. (N. S.) 862, 127 Am. St. Rep. 492. Defendant cites no authority, and we know of none, extending this privilege to proceedings before an executive department or officer. Assuming, without deciding, that it can be so extended, and that the conditions of such a privilege would on the facts of the instant case be fulfilled, such a privilege is not available to the defendant, because a comparison of the charges made by Mrs. Ward with the articles published by the defendant demonstrates that the defendant was not reporting the charges and any action thereon by the officers with whom she filed them. We print in the margin the more serious of Mrs. Ward's charges—those filed with the President. The defendant's articles, especially those in rhyme which were the subject of the first two counts in the plaintiff's declaration, greatly enlarged upon and embel-

lished Mrs. Ward's charges. Indeed, they amounted themselves to charges against the plaintiff to the public.''

It is argued that the articles in question come within the rule of the report of fair criticism and comment of public officers and of matters in which the public interest is concerned. Again while the privilege as to such matters is recognized, yet again when the newspaper goes further and states as a fact that which is not true and which is libelous *per se,* then the privilege ceases and the truth only will justify.

In the case of *Cooper v. Lawrence,* 204 Ill. App. 261, on page 266, the court said:

''Fair and reasonable comment and criticism upon the acts of judicial officers, which are matters of public concern, are allowable, and are sometimes called 'privileged.' The right to make and publish such reasonable comment and criticism, however, does not extend so far as to permit false statements of facts, and the subject of reasonable comment and fair criticism must be a fact and not a libel.''

And again beginning on page 266, the court said:

''The office of judge is considered by many as one of the most important in the community. It is, of course, unique, unlike all others; it deals only in the administration of justice, upon which is dependent, in part at least, the peace of the community. Of course all are free to speak and publish the truth of the courts and judges; and reasonable comment upon and fair criticism of what they have done is to be encouraged; but a false statement of fact concerning a judge may be published only at one's peril. 'It is one thing to comment upon or criticise, even with severity, the acknowledged or proved acts of a public man, and quite another to assert that he has been guilty of particular acts of misconduct.' Quoted with approval by Mr. Justice HOLMES in *Burt v. Advertiser Newspaper Co.,*

154 Mass. 238; *People v. Fuller,* 238 Ill. 116; 1 Starkie on Slander 118; *Rearick v. Wilcox,* 81 Ill. 77; *Robbins v. Treadway,* 25 Ky. 540; *Triggs v. Sun Prtg. Pub. Co.,* 179 N. Y. 144; *Commonwealth v. Clap,* 4 Mass. 163.'' (*Cooper v. Illinois Publishing & Printing Co.,* 218 Ill. App. 95; *Sweet v. Post Pub. Co.,* 215 Mass. 450, 102 N. E. 660, 47 L. R. A. (N. S.) 240.) In the case of *Washington Times Co. v. Bonner,* 66 App. D. C. 280, 86 F. (2d) 836, 110 A. L. R. 393, 401, the court stated:

''The law recognizes also, as a defense in defamation actions, a right of fair comment upon matters of public interest. There is a division of authority, however, upon this subject. The courts in a few states hold that the right of fair comment on matters of public interest extends, in the absence of malice, to misstatements of fact. The leading case representative of that view is *Coleman v. MacLennan,* 78 Kan. 711, 98 P. 281, 20 L. R. A. (N. S.) 361, 130 Am. St. Rep. 390. Other cases to the same effect are: *Mulderig v. Wilkes-Barre Times,* 215 Pa. 470, 64 A. 636, 114 Am. St. Rep. 967; *Bays v. Hunt,* 60 Iowa, 251, 14 N. W. 785; *Ross v. Ward,* 14 S. D. 240, 85 N. W. 182, 86 Am. St. Rep. 746. An annotation in L. R. A. 1918 E, pp. 68 et seq., discusses the minority rule. The theory underlying that view seems to be that free press discussion of matters of public interest is so important to the public that there should be no restriction upon newspaper statements except good faith in making them, i. e., honest belief in their truth regardless of their actual verity—that it is better to expose individual reputation to misstatement than to lay any restriction, except an absence of malice upon public discussion.

But the great weight of authority in the state courts, and the rule in the Federal courts, is to the contrary— that the right of fair comment does not extend to misstatements of fact. More than a score of the state courts take this view. See L. R. A. 1918 E, pp. 54 et seq. The leading case in the state courts for the ma-

jority view is *Burt v. Advertiser Newspaper Co.,* 154 Mass. 238, 28 N. E. 1, 13 L. R. A. 97. There the defendant's newspaper articles charged the plaintiff with fraud in the conduct of his duties at the New York Custom House. The trial court had ruled that the publication was not privileged if the statements made therein were false, however reasonable the defendant's belief in their truth. This view the Supreme Judicial Court of Massachusetts held correct. The opinion was by Judge OLIVER WENDELL HOLMES, who said:

'But there is an important distinction to be noticed between the so called privilege of fair criticism upon matters of public interest, and the privilege existing in the case, for instance, of answers to inquiries about the character of a servant. In the latter case, a bona fide statement not in excess of the occasion is privileged, although it turns out to be false. In the former, what is privileged, if that is the proper term, is criticism, not statement, and however it might be if a person merely quoted or referred to a statement as made by others, and gave it no new sanction, if he takes upon himself in his own person to allege facts otherwise libellous, he will not be privileged if those facts are not true. The reason for the distinction lies in the different nature and degree of the exigency and of the damage in the two cases. In these, as in many other instances, the law has to draw a line between conflicting interests, both intrinsically meritorious. When private inquiries are made about a private person, a servant, for example, it is often impossible to answer them properly without stating facts, and those who settled the law thought it more important to preserve a reasonable freedom in giving necessary information than to insure people against occasional unintended injustice, confined as it generally is to one or two persons. But what the interest of private citizens in public matters requires is freedom of discussion rather

than of statement. Moreover, the statements about such matters which come before the courts are generally public statements, where the harm done by a falsehood is much greater than in the other case. If one private citizen wrote to another that a high official had taken a bribe, no one would think good faith a sufficient answer to an action. He stands no better, certainly, when he publishes his writing to the world through a newspaper, and the newspaper itself stands no better than the writer.' (154 Mass. 238, at pages 242, 243, 28 N. E. 1, 4, 13 L. R. A. 97.)

In the Federal courts the leading case is *Post Pub. Co. v. Hallam* (C. C. A.) 59 F. 530. In that case a newspaper article published by the defendant insinuated that the plaintiff, a candidate for public office, had received a money consideration for using his influence to procure the nomination of his rival. The United States District Court for the Southern District of Ohio had at the trial instructed the jury in substance and effect that:

'the public acts of public men (and candidates for office were public men) could be lawfully made the subject of comment and criticism, not only by the press, but also by all members of the public, for the press had no higher rights than the individual; but that while criticism and comment, however severe, if in good faith, were privileged, false allegations of fact, as, for instance, that the candidate had committed disgraceful acts, were not privileged, and that, if the charges were false, good faith and probable cause were no defense . . .' (59 F. 530, at page 539.)

This instruction was held correct by the Circuit Court of Appeals for the Sixth Circuit in an opinion written by then Circuit Judge TAFT:

'The existence and extent of privilege in communications are determined by balancing the needs and good of society against the right of an individual to

enjoy a good reputation when he has done nothing which ought to injure it. The privilege should always cease where the sacrifice of the individual right becomes so great that the public good to be derived from it is out-weighed. Where conditional privilege is extended to cover a statement of disgraceful fact to a master concerning a servant or one applying for service, the privilege covers a bona fide statement, on reasonable ground, to the master only, and the injury done to the servant's reputation is with the master only. This is the extent of the sacrifice which the rule compels the servant to suffer in what was thought to be, when the rule became a law, a most important interest of society. But, if the privilege is to extend to cases like that at bar, then a man who offers himself as a candidate must submit uncomplainingly to the loss of his reputation, not with a single person or a small class of persons, but with every member of the public, whenever an untrue charge of disgraceful conduct is made against him, if only his accuser honestly believes the charge upon reasonable ground. We think that not only is such a sacrifice not required of every one who consents to become a candidate for office, but that to sanction such a doctrine would do the public more harm than good.

We are aware that public officers and candidates for public office are often corrupt, when it is impossible to make legal proof thereof, and of course it would be well if the public could be given to know, in such a case, what lies hidden by concealment and perjury from judicial investigation. But the danger that honorable and worthy men may be driven from politics and public service by allowing too great latitude in attacks upon their characters outweighs any benefit that might occasionally accrue to the public from charges of corruption that are true in fact, but are incapable of legal proof. The freedom of the press is not in danger from the enforcement of the rule we uphold. No

one reading the newspaper of the present day can be impressed with the idea that statements of fact concerning public men, and charges against them, are unduly guarded or restricted; and yet the rule complained of is the law in many of the states of the Union and in England.' (59 F. 530, at pages 540, 541.)

See, also, representative of the Federal rule, *Nevada State Journal Pub. Co. v. Henderson* (C. C. A.) 294 F. 60, certiorari denied 264 U. S. 591, 44 S. Ct. 404, 68 L. Ed. 865.

In *Russel v. Washington Post Co.*, 31 App. D. C. 277, 14 Ann. Cas. 820, and in *Ashford v. Evening Star Newspaper Co.*, 41 App. D. C. 395, we quoted with approval from cases representing the majority rule, and in *A. S. Abell Co. v. Ingham*, 43 App. D. C. 582, we applied it. But in the last case the contrary view was not seriously urged, and we did not discuss the authorities; hence we have in the instant case considered the question anew and have examined with care the leading cases, including those cited by the defendant, and we feel constrained to follow the majority rule as the better view. It follows that we must sustain the rulings of the trial court assigned as error in this aspect of the present case.''

The rule is no different than the report on crime and criminal charges. One is privileged to publish the actual facts as to such matter, the facts of arrest, and the charges made, but when the newspaper goes further and charges directly or by inference, insinuation or assumption that the person is guilty of the crime, then the privilege ceases and liability will entail unless the truth can be proven. (33 Am. Jur. p. 161, par. 167, chapter on Libel and Slander.)

To falsely charge one with the commission of a crime is libelous *per se.* (*Zurawski v. Dziennik Zjednoczenia Pub. Corp.*, 286 Ill. App. 106.) Moreover, the statute of Illinois describes libel as being ''a malicious defamation, expressed either by printing or by

signs or pictures, or the like, tending to blacken the memory of one who is dead, or to impeach the honesty, integrity, virtue or reputation or publish the natural defects of one who is alive, and thereby to expose him to public hatred, contempt, ridicule or financial injury.'' (Smith-Hurd Ill. Rev. Stat. 1933, ch. 38, par. 402 [Jones Ill. Stats. Ann. 37.348].)

Under the statute of the State of Illinois, a publication which charges a public official with dishonesty, corruption of an office, or want of integrity, is libelous *per se*. (*People v. Fuller*, 238 Ill. 116; *Rearick v. Wilcox*, 81 Ill. 77; *Cooper v. Illinois Pub. & Printing Co.*, 218 Ill. App. 95; *Cooper v. Lawrence*, 204 Ill. App. 261.)

To charge one with a crime of bribery is libelous *per se*. (*People v. Fuller*, 238 Ill. 116; *Rearick v. Wilcox*, 81 Ill. 77; *VanIngen v. Mail & Express Pub. Co.*, 156 N. Y. 376, 50 N. E. 979; *Randall v. Evening News Ass'n*, 79 Mich. 266, 7 L. R. A. 309; *Robbins v. Treadway*, 2 J. J. Marsh. 540 (Ky.), 19 Am. Dec. 152.) In the case of *Robbins v. Treadway*, 2 J. J. Marsh. 540 (Ky.), 19 Am. Dec. 152, it is held that the charges that the judge had made the office of clerk a subject of private negotiation between men to whom he was under personal obligations, and endeavored to cancel those debts by a barter of office, is libelous *per se*. The court said:

''This last charge is actionable so far, and so far only, as it imports the imputation of corruption in office. Anything which assails the integrity or capacity of a judge is actionable. If it could be proved that the judge sold his patronage or derived any pecuniary advantage in selection of his clerks, this charge would be justified. But as it is a charge of sale and corruption, nothing but proof of such sale and corruption can justify it. To charge a judge with improprieties, which would not be cause of impeachment or address

would be no more actionable than would be the same charge made against a private citizen.''

The crime of bribery is defined by the statute of the State of Illinois among other things, as follows:

''Whoever corruptly, directly or indirectly, gives any money or other bribe, . . . to any judge, . . . or other officer . . . after his election or appointment, either before or after he is qualified . . . in consideration that such officer hath nominated or appointed any person to any office, . . . the person so giving, and the officer so receiving any money, bribe, . . . with intent or for the purpose or consideration aforesaid, shall be deemed guilty of bribery, and shall be punished by confinement in the penitentiary for a term not less than one year nor more than five years.'' (Smith-Hurd Ill. Rev. Stat. 1933, ch. 38, par. 78 [Jones Ill. Stats. Ann. 37.508].)

■ An article is to be understood according to the natural and obvious meaning of the words used, taking into consideration the article as a whole and including the headlines. (*People v. Spielman,* 318 Ill. 482, 488; *Ogren v. Rockford Star Printing Co.,* 288 Ill. 405; *Willfred Coal Co. v. Sapp,* 193 Ill. App. 400, 412; *Marshall v. Chicago Herald Co.,* 185 Ill. App. 224, 226; *Cooper v. Illinois Publishing & Printing Co.,* 218 Ill. App. 95, 115; *Dorr v. United States,* 195 U. S. 138, 49 L. Ed. 128, 134; *Commercial Pub. Co. v. Smith,* 149 Fed. 704, 705; *Stone v. Hutchinson Daily News,* 125 Kan. 715, 266 Pac. 78, 80; *Jerald v. Houston,* 124 Kan. 657, 261 Pac. 851, 855.)

We think it patent from the reading of the article as a whole, in which the lead paragraphs hereinbefore set out appear, including the headlines, that the same constituted a direct charge by the newspaper of the things stated therein, namely, that plaintiff, as judge, sold jobs; that his was a court of justice demanding and receiving part of the salary of his own employees

at the price of employment; that he was guilty of the criminal offense of bribery; that he was dishonest in discharging the duties of his office. These statements charge commission of a crime and tend to impeach the honesty, integrity, and reputation of plaintiff, and are libelous *per se*. A reading of all the articles on the subject does not change this.

Malice is the gist of the action of libel. The differentiation between a thing which is malice *per se*, that is in themselves, and those which are actionable *per quod*, is that in those words which are actionable *per se*, damages need not be specially proven and malice will be implied, whereas in those words which are actionable *per quod* only, malice and damages must be proven. In the case of *Layne v. Tribune Co.*, 108 Fla. 177, 146 So. 234, 86 A. L. R. 466, 470, the court said:

"The law has always made a distinction between false imputations that may be actionable in themselves, or per se, and those that may be actionable only on allegation and proof of special damage, or per quod. Words of both classes are actionable on the same grounds and for the same reasons. But a distinction between the two is based on a rule of evidence. The noxious quality in both lies in the fact that they are the natural and proximate causes of pecuniary damage to those concerning whom such words are maliciously written. The essential difference between the two lies in the matter of proof of the resulting injury.

In the case of words actionable per se their injurious character is a fact of common notoriety established by the general consent of men, and the courts consequently take judicial notice of it. Words amounting to a libel per se necessarily import damage and malice in legal contemplation, so these elements need not be pleaded or proved, as they are conclusively presumed as a matter of law in such cases. Notes: 12 Am. Dec. 39; 9 Eng. Rul. Cases 11, 17 R. C. L. 264.

But words or publications actionable only per quod are those whose injurious effect must be established by due allegation and proof. In determining their actionable nature the courts must, unless controlled by some settled precedent, decide in accordance with the general and fixed current of opinion of the locality of publication as to the damaging effect of the charge contained or suggested in the words used. Because of this, judicial decisions of the past are so apt to vary with the social and moral views of the different jurisdictions, that in cases where the utterances or publications of the defendant are not clearly actionable per se, the surrounding circumstances and conditions must be taken into account to determine the matter. Note 12 Am. Dec. 39; *Cole v. Millspaugh,* 111 Minn. 159, 126 N. W. 626, 28 L. R. A. (N. S.) 152, 137 Am. St. Rep. 546, 20 Ann. Cas. 717, note.''

In the case of *Marion v. Davis,* 217 Ala. 16, 114 So. 357, 55 A. L. R. 171, 174, the court said:

''The foundation of an action for libel or slander is a malicious injury to reputation and any false and malicious imputation of crime or moral delinquency by one published of and concerning another which subjects the person to disgrace, ridicule, odium or contempt in the estimation of his friends and acquaintances, or the public, with resulting damage to his reputation is actionable either per se or per quod.

In cases of libel, if the language used exposes the plaintiff to public ridicule or contempt, though it does not embody an accusation of crime, the law presumes damage to the reputation and pronounces it actionable per se . . . .'' (*Gilmer v. Eubank,* 13 Ill. 271, 275, 33 Am. Jur. p. 113.)

The trial court below found as a fact that the defendants were guilty of actual malice. Malice may be one in fact or one implied by law. As we have heretofore stated, where the words used are such as to be libelous *per se,* the law will imply malice, and such

is presumed. (*Rearick v. Wilcox,* 81 Ill. 77; *Stephens v. Commercial–News Co.,* 164 Ill. App. 6; *Beeson v. H. W. Gossard Co.,* 167 Ill. App. 561; *Schofield v. Baldwin,* 102 Ill. App. 560; *Schmisseur v. Kreilich,* 92 Ill. 347, 86 A. L. R. 466, 470.)

Whether implied or not, there may also be malice in fact. Malice in fact is "a formed design of doing mischief to another." (*First Nat. Bank of Flora v. Burkett,* 101 Ill. 391, 394.) It is also defined as follows: "actual malice or malice in fact, means a positive desire and intention to annoy or injure another person." (34 Am. Jur. p. 681.)

■ The existence of malice may be inferred. Actual malice may be inferred from falsity, absence of proper cause, or other relative circumstances, or it may be deduced from the libel itself, or from the communication of which it forms a part. All circumstances surrounding the transaction are proper for consideration, including the failure to make a proper investigation. (33 Am. Jur. pp. 247 to 251, chapter on Libel and Slander, pars. 266 and 267. In the case of *Chambers v. Leiser,* 43 Wash. 285, 86 Pac. 627, 10 Ann. Cas. 270, 54 A. L. R. 1148, the court said:

"It was therefore incumbent upon plaintiff, by means of the matters in the letter or by any other competent evidence, to show that defendant had been actuated by malice or ill will towards plaintiff, or had included in said communication false and libelous matters, not pertinent or reasonably necessary to the subject matter which it was defendant's privilege to communicate, or that defendant had not made reasonable inquiry and investigation, but had written recklessly or knowingly, falsely and not in good faith; and upon establishing any of these matters, the plaintiff would have been entitled, on account of the presumption of malice, falsity, and injury arising from the matter libelous per se, to recover, unless the defendant should

have established the truth of the letter's libelous contents.''

In the case of *Massee v. Williams,* 207 Fed. 222, 124 C. C. A. 492, 54 A. L. R. 1148, the court said:

''The presumption of freedom from malice running in favor of the defendant, the burden of proving that he did not abuse his privilege did not rest on him. On the contrary, the burden was on the plaintiff to prove malice in fact, which might be done not only by extrinsic evidence of personal ill feeling, but also by intrinsic evidence, such as the original language of the slander, the mode and extent of the publication, and other matters in excess of the privilege.''

In the case of *Gassett v. Gilbert,* 6 Gray (Mass.) 94, 54 A. L. R. 1149, it was said:

''The sole duty of the court, therefore, in such cases, is to determine whether the occasion, in the absence of actual malice, would justify the publication. If so, then it is incumbent on the plaintiff to prove the evidence of malice, in order to sustain his action; and this must be shown to the satisfaction of the jury, whose exclusive province it is to pass upon the question. But it is not necessary to prove it by extrinsic evidence. It may be inferred from the relation of the parties, the circumstances attending the publication, and even from the terms of the publication itself.''

In the case of *Kenney v. Gurley,* 208 Ala. 623, 95 So. 34, 26 A. L. R. 813, 817, the court said:

''Such malice, actual or express, may be shown by evidence of previous ill will, hostility, threats, rivalry, other actions, former libels or slanders, and the like, emanating from the defendant, or by the violence of defendant's language, the mode and extent of publication, and the like.''

In the case of *Watt v. Longsdon,* [1930] 1 K. B. 130, 69 A. L. R. 1005, 1020, the court stated:

"I think the defendant's conduct in disseminating the gross charges that he did to the plaintiff's wife, and to Mr. Singer, and repeating and to some extent adding to them in his letter to Mr. Browne, and his offer to provide funds for procuring the evidence of the two women in Casa Blanca, affords some evidence of malice which ought to have been left to the jury."

In the case of *Flynn v. Reinke,* 199 Wis. 124, 225 N. W. 742, 63 A. L. R. 1113, 1116, the court said:

"The law will impute malice where a defamatory publication is made without sufficient cause or excuse."

As has hereinbefore appeared, the defendants were the moving forces in the events leading up to the publication of the libel. No investigation of the facts was made, but the statements of a discharged, disgruntled employee were accepted by them as being true. The evidence showed that they did not know Judge Cook other than who he was, and they were content with the issue simply by publishing his denial and making the charges without further investigation. Judge Cook had lived in East St. Louis practically all of his life and had lived at the same address for more than 20 years. He had been elected city judge by the people of East St. Louis, his father before him had been city judge.

The newspaper in which the alleged libelous statements were published consisted of 10 pages. Five-eighths of the front page was devoted to the subject matter of the alleged libel. The headlines of Mrs. Kelly's affidavit and the article in which the direct charge of "Judge selling jobs—" and the like, extended across five columns of the eight column newspaper. The headlines across the five columns were: first line, "Shakedown Charges Against"; second line, "Judge Cook Made by Widow." The capital letters in the headlines were in 72 Cheltenham size type; were

in upper case letters; and were ⅝ths inch in height. The subheadlines, "Employe Says Payment Made to Keep Job," were in 48 point type. Mrs. Kelly's affidavit was three columns wide and extended downward about a foot in length. The newspaper print of the publication was that ordinarily used by newspapers. The lead paragraphs were in type slightly larger than the ordinary type used. Below Mrs. Kelly's affidavit appeared a picture of Judge Cook with a notation over it of "Charged," and three columns were devoted to his denial of Mrs. Kelly's accusation. Across the top of these three columns were the words: " 'G — D — Liar,' Cook says in Flat Denial." These were in letters about ⁷⁄₁₆ths inch in height. In all, ⅝ths of the front page of the paper was devoted to the subject matter, and in addition thereto, about ⅝ths of the second page, which was devoted to news. On this second page appeared a two-column picture of Mrs. Kelly under the heading of "Makes Shakedown Charges." The articles were run with headlines in type ⅛th and ⁵⁄₁₆ths inch in height. They are: "Mrs. Kelly and Judge Cook Were High School Companions"; "Widow Ready to Lose Job for Sake of Justice."

The population of East St. Louis, according to the 1930 census, was 74,347. There were printed 14,609 copies of the Journal containing the alleged libelous articles; 12,815 were distributed in East St. Louis; 1,794 were distributed outside of East St. Louis.

As before stated, the officers and employees of the defendant publisher's newspaper who testified in the cause, all said that none knew Judge Cook before the publication other than to know who he was.

About one half of page 3 of the newspaper was devoted to news, and the other to ads. The fourth page consisted of the editorials of the newspaper and feature articles by special writers. Page 5 was the society news, including some ads. Pages 6 and 7 were the sport news. Page 8 consisted of comics and a

crossword puzzle. Page 9 was classified advertisements, and page 10 was photographs.

The matter was handled all out of proportion to any news value or any reasonable construction of fair comment and criticism. As before stated, page 4 was set aside as the editorial column. This is the place ordinarily used by newspapers for comment and criticism, and not the lead paragraphs of alleged news stories.

We conclude the trial court was right in its conclusion that the defendants were guilty of malice in fact.

 It is claimed that the damages are excessive, and at the most, only nominal damages should have been imposed. The trial judge fixed the damages at $20,000. This is ordinarily a question for determination by the jury or the trial judge. In the case of *Storey v. Wallace* (60 Ill. 51 at page 56), the court said:

"It is suggested by appellants' counsel, in the conclusion of their argument, though only suggested, that the judgment should be reversed because of excessive damages. It must be a case of flagrant wrong, one in which the jury has been manifestly led away by prejudice or passion, to justify a court in setting aside a verdict in an action for libel, on the mere ground of excessive damages, where there have been two verdicts for the plaintiff, and the first has been substantially reduced on the second trial."

In the case of *Scott v. Times-Mirror Co.,* 181 Cal. 345, 184 Pac. 672, 12 A. L. R. 1007, 1022, the court stated:

"Appellant's motion for a new trial was made on the ground, among others, that the award of actual damages was excessive. The motion was denied. The amount of such damages, therefore, stands approved by the trial court, and, under the well-established rule, the question of the excessiveness of the verdict being primarily addressed to the discretion of the trial court, we cannot disturb it unless it appears that such award

is the result of passion or prejudice." (*O'Malley v. Illinois Pub. & Printing Co.*, 194 Ill. App. 544, 557.)

As we before stated, where the defamation is actionable *per se*, the general damages without proof of loss or injury, is conclusively presumed. Where actual malice exists, punitive damages may be awarded. (*Cooper v. Illinois Publishing & Printing Co.*, 218 Ill. App. 95; *O'Malley v. Illinois Publishing & Printing Co.*, 194 Ill. App. 544, 557; *Beeson v. H. W. Gossard Co.*, 167 Ill. App. 561; *Moore v. Maxey*, 152 Ill. App. 647, 649; *Schofield v. Baldwin*, 102 Ill. App. 560; *Schmisseur v. Kreilich*, 92 Ill. 347, 33 A. L. R. 414.)

The damages to be awarded must be once and for all. In considering the actual damages, the trial judge was entitled to consider the wide publicity given to the libel, plaintiff's prominence in the community where he lives, his professional standing, his character, good name and reputation, his injured feelings and his mental suffering which the defamatory publication has caused and he has the right to take into consideration not only the damage that has accrued, but also such damage, if any, as will arise from the defamatory words in the future. (110 A. L. R. 405, 406; 12 A. L. R. 1021; *O'Malley v. Illinois Publishing & Printing Co.*, 194 Ill. App. 544, 557; *Moore v. Maxey*, 152 Ill. App. 647, 649.) The amount of damages was primarily for the trial judge.

The defendant, East Shore Newspapers, Inc., was the publisher of two large city newspapers. They expended more than $6,000 in keeping Mrs. Kelly within the jurisdiction of the court.

Regarded either as actual or punitive damages, we do not believe that the damages are excessive. (*O'Malley v. Illinois Publishing & Printing Co.*, 194 Ill. App. 544, 557; *Prussing v. Jackson*, 208 Ill. 85; *Ransom v. McCurley*, 140 Ill. 626; *Washington Times Co. v. Bonner*, 66 App. D. C. 280, 86 F. (2d) 836, 110 A. L. R. 393, 411; *New England Newspaper Pub. Co.*

*v. Bonner* (C. C. A.), 77 F. (2d) 915, certiorari denied 296 U. S. 610, 56 S. Ct. 128, 80 L. Ed. 433, 110 A. L. R. 411; *Scott v. Times-Mirror Co.*, 181 Cal. 345, 184 Pac. 672, 12 A. L. R. 1007, 1010.)

The only remaining questions are the contentions of the defendants that the finding and judgment was in violation of and a denial of defendants' rights under art. II, sec. 4, of the Constitution of the State of Illinois, and in violation of and a denial of defendants' rights under the First and Fourteenth Amendments of the Constitution of the United States. What we have heretofore said answers these contentions. While the right of free speech and free press is recognized, which includes the right to publish matters in the interest of the public and to criticize and condemn public officials, it does not include the right to libel them.

The judgment of the circuit court of St. Clair county is affirmed.

*Affirmed.*